ESTHER WILLIAMSON, ADMINISTRATRIX OF THE ESTATE OF ZOLLIE WILLIAMSON, DECEASED, v. ROBERT L. CLAY.

(Filed 13 January, 1956.)

**1. Negligence § 1—**

Actionable negligence embraces negligence and proximate cause.

**2. Trials § 22a—**

In determining its sufficiency for submission to the jury, the evidence, whether offered by plaintiff or by defendant, must be considered in the light most favorable to plaintiff.

**3. Negligence § 1—**

A person who enters upon an active course of conduct is under positive duty to exercise ordinary care to protect others from harm, and a violation of this duty is negligence.

**4. Negligence §§ 3, 19b (1)—Evidence held for jury on issue of defendant's negligence in failing to anticipate or ascertain that can contained inflammable substance before throwing contents on fire.**

The evidence tended to show that while intestate was using an acetylene torch in repairing an automobile, the upholstery of the car caught fire, that the defendant, proprietor of the shop, upon hearing the call of fire, hurriedly picked up a can having a little liquid in its bottom, filled the can with water, and threw the contents upon the fire, and that an explosion immediately followed, resulting in the fatal burning of intestate. Defendant testified to the effect that he picked up a particular can used exclusively as a container for water, but other evidence raised permissible inferences that there were numerous cans in and about the premises, and that the contents of each can, in the absence of inspection, were known only by the person last using it or by one observing such use. *Held:* The evidence was sufficient to present the question whether defendant should reasonably have anticipated that the liquid he saw in the can might have been gasoline or other inflammable liquid and whether his actions under the circumstances constituted a failure on his part to use the care of a reasonably prudent man under like conditions, defendant's version of the matter not being the only reasonable inference deducible from the evidence.

**5. Trial § 22b—**

Defendant's testimony cannot warrant judgment as of nonsuit when there is other evidence favorable to plaintiff at variance therewith, since it is for the jury to pass upon the credibility of the witnesses and the weight to be given the testimony.

**6. Trial § 31b—**

Even in the absence of request for special instructions, a failure to charge the law on the substantive features of the case arising on the evidence is prejudicial error. G.S. 1-180.

**7. Negligence § 14½—**

What constitutes due care in a sudden emergency is to be determined in the light of what an ordinarily prudent person would have done under such emergency circumstances.

**8. Negligence § 20—**

Defendant's evidence tended to show that he was confronted by a fire in the upholstery of a car being repaired, that he picked up a can and filled it with water and threw the contents on the fire, that when he picked up the can it had a little liquid in the bottom which he thought was water, but which turned out to be gasoline or other inflammable liquid. Defendant contended he was confronted by an acute emergency. *Held:* The court should have applied the apposite legal principles to defendant's evidence, and a general instruction on the doctrine of sudden emergency is insufficient.

APPEAL by defendant from *Hall, Special Judge,* May-June, 1955, Civil Term, of DURHAM.

Action by administratrix to recover damages, (1) for wrongful death of intestate and (2) for personal injuries between injury and death.

The intestate, hereafter called Williamson, received injuries on 4 June, 1952, consisting of burns. He died 17 June, 1952.

Defendant operated a small automobile repair business. He had less than five employees. Hence, the Workmen's Compensation Act is inapplicable.

Williamson had worked for defendant since 1950, not regularly but intermittently for brief periods. He was paid on a commission basis. His last employment began shortly before June 4th.

Defendant's premises consisted of two adjoining rooms, the garage and the body shop. There was a door in the wall that divided these two rooms. Each room had a door or doors opening upon an alley. This alley extended along the west side of the premises. There was no street frontage, the premises being in the interior of the block.

Uncontradicted evidence, offered by defendant, tends to show that about 10 o'clock on the morning of June 4th, defendant put Williamson to work on the job of cutting a panel from over the right rear wheel of a Pontiac car then in the body shop; that defendant, by use of a chisel and hammer, marked out the section Williamson was to cut out; that defendant turned these tools over to Williamson and left the premises; that defendant returned between 12:30 and 1 o'clock, at which time Williamson was going ahead with the work, as marked out by defendant, using the chisel and hammer; that defendant left the premises again, returning about 3 o'clock, at or about the time the fire started; that some 10 or 15 minutes before the fire started, Williamson laid aside the chisel and hammer and began to cut the panel by means of an acetylene torch; that a portion of the upholstery caught on fire from the flame of the torch; that in response to the cry of "Fire," defendant hurriedly picked up a can, filled it with water, pushed Williamson aside and threw the contents on the fire, at which time an explosion occurred; and

that both Williamson and defendant were burned as the result of such explosion.

Plaintiff's evidence as to what happened on the occasion of the explosion consisted solely of statements attributed to defendant.

Esther Williamson, widow and administratrix, testified that defendant told her that "he picked up a can and got some more water and threw it on the little fire, and . . . when he did it exploded . . . it must have had gasoline in it and . . . that was when he messed up."

Plummer Williamson, brother of the deceased, testified that defendant told him that "he ran to the back door, saw a can sitting there by the car and grabbed it, and that he, Clay, dashed it up there on the fire, and that it flamed. . . . that it must have been gas instead of water, . . ." On cross examination, he testified that defendant told him that "when he picked up the can he thought there was water in it, but that it must have been gas; that he came in there and threw whatever the can contained on the fire, and it flamed up . . ."

David Williamson, brother of the deceased, testified that defendant told him that he "came in and saw the blaze, and . . . took the can and threw some water on it, and it must have been gas instead of water . . ."

Esther Williamson, when recalled after completion of defendant's evidence, testified that up until 5 May, 1952, she had assisted Williamson from time to time, when he was working for defendant at nights in the body shop, helping him to sandpaper cars and put paper on the glass in preparation for painting; that at that time a square 5-gallon can with the top cut out was used for water for the sandpaper; that this can had some kind of label on it; that there was a bench in the body shop on and under which there were a lot of different cans containing paint and paint thinner, some full and some empty; and that there were about 50 empty cans of various sizes, varying from one pint to five gallons, "around that garage."

Uncontradicted evidence, offered by defendant, tends to show that sandpaper was soaked in water in order "to cut the surface faster," preparatory to painting a car.

Lane, a witness for defendant, testified in substance that on and prior to June 4th he was employed by defendant as a mechanic; that on June 3rd he saw Williamson at work in the body shop, sanding the fender of a Chevrolet and getting ready to paint it; that Williamson on that occasion took a can which he had been using and which Clay was accustomed to use when sanding, and drew gasoline from the Chevrolet on which he was working by means of a siphon hose into this can; that he had never seen this can used for anything but water; and that this was the can that defendant picked up on June 4th, on the occasion of

the fire. (Lane's testimony gives no explanation as to why Williamson drew the gasoline or as to what use, if any, he made of it.) Lane described the particular can as "a clean, slick can the color of metal, like the kind that oil ordinarily comes in." He testified further: "There were other cans like this about the garage, but the one which Robert Clay used with water was in the back, the others were in the front. I had always seen Robert Clay use that particular can for water."

Lane testified further: "Automobile paint in cans was kept on the shelf on the south side of the body shop." Also: "The can which Robert Clay used was the only one with the top out back in the work shop. I was in and out of the body shop every day, and that was the only can that I had seen in there with the top out." As to the use of gasoline in and about the garage, Lane testified: "We do not use gasoline to wash the parts of automobiles, but rather kerosene. When we do wash parts in gasoline we use something like a foot tub, or a two- or three-gallon bucket, but mostly we use kerosene."

Parrish, a witness for defendant, testified that he went to defendant's premises the morning of June 4th and stayed there until after the fire occurred. His business there, if any, is not disclosed; but he testified that he went "in that place practically every day." He testified in substance that when defendant heard the cry of "Fire," he came from the outside, picked up a bucket in the garage north of the wall which separated the garage on the north from the body shop on the south, drew water from a faucet on the west wall of the garage, went back out side, then into the body shop, and threw the contents of the bucket on the fire. This witness described the container used by defendant as "a round paint bucket, without a handle, brass in color, about a gallon in size, and the paper was torn off, the top had been cut off with a hammer and chisel." He testified further that defendant had had this bucket in the paint room (body shop) for quite a while; that he had never seen any gasoline put in that bucket; that the bucket was used for water in sanding fenders; and that there was no other bucket around.

Brooks, a witness for defendant, testified that he was on defendant's premises, in the telephone booth in the body shop; that when the upholstery caught on fire, Williamson yelled, "Car on fire," then "threw the torch down, cut it off, and about that time Robert Clay came in the door"; that defendant picked up a bucket, sitting between the car and the faucet, filled it with water, pushed Williamson (who was standing near the door of the car, leaning in) aside and threw the contents of the bucket on the fire; and that he (Brooks) chased Williamson around, finally caught him, threw him down and smothered the fire with an overcoat. Brooks described the bucket as "a square bucket about a 4- or 5-gallon size. The top had been cut out, and I had seen the

bucket before." He testified that he knew this was the bucket for water in which to dip sandpaper before using it to smooth the surface of a car.

Defendant testified that he was across the alley, at another garage some 8 feet away, when he heard Williamson yell, "Bob, the car's afire"; that he "went in and looked around and found . . . the water bucket . . . went to the spigot, drew up some water, and came back and threw it on the fire. . . . When (he) threw it on the fire, it exploded"; that when he "rushed back to the right side of the car" he "pushed Zollie out of the way so (he) could get to the fire"; that Williamson was still standing in the door of the car "with the torch in his hand and the torch was burning"; that, when the explosion occurred, the fire got on his (defendant's) arms and some on his head; that he (defendant) "threw the can out of the door and went to fighting the fire, beating it out"; that he looked around·and saw Williamson "with the torch in his hand and the fire was running up his hand to his shoulder"; and that Williamson then took out, running around until Brooks finally caught him and put out the fire on Williamson's clothes.

Defendant testified further that when he ran into the body shop "the can was sitting behind the car on the floor"; that, when he picked it up "there was a little fluid in the bottom but not enough to throw on the fire"; that he thought "there was water in the can, but it wasn't enough to put on the fire, so (he) ran and got water from the spigot"; that when he picked up the can he "looked at it and saw sandpaper in the bottom. It appeared wet"; and that the can, when he picked it up, was approximately 20 feet from the spigot.

Defendant testified further that "if water and gasoline are together in a can, the gasoline will come to the top." Also: "Maybe I can tell the difference between gasoline and water by getting right down and looking at it. I can tell the difference by smelling of it. I did not smell the contents of the bucket." He testified further that he kept and mixed paints on a *work bench,* "six feet long, 2½ feet wide, and a little less than 3 feet high," in the body shop.

Defendant described the container used as "a square can, about six by four inches"; that this particular can, originally a paint can, the top of which he had cut out, had been used to soak sandpaper in water for approximately ten years; and that if Williamson had put gasoline in this sanding can, which he picked up on that occasion, he had no knowledge or notice that this had been done or that there was gasoline or other explosive or inflammable liquid in the can instead of water.

The evidence was somewhat in conflict as to the extent of the fire. Plaintiff's evidence tends to show that it was a small fire, only a small portion of the upholstery having been "singed."

Defendant's evidence tended to show that he had established rules: (1) that no gasoline or other inflammable fluid was to be kept in the body shop; and (2) that the acetylene torch was not to be used in the body shop. There was evidence tending to show that the acetylene torch had been used in the body shop from time to time by defendant and by others in his presence, which was contradicted by testimony of defendant.

The evidence was conflicting as to whether Williamson's death on June 17th was proximately caused by the burns he received on June 4th.

The jury answered all issues in favor of plaintiff. The first issue related to defendant's negligence as the proximate cause of Williamson's injury, the third issue related to defendant's negligence as the proximate cause of Williamson's death; and the second issue related to Williamson's contributory negligence. The jury awarded $1,000.00 damages for the injuries suffered between June 4th and June 17th and $5,000.00 damages for the wrongful death.

Judgment in plaintiff's favor for $6,000.00 and costs was signed. Defendant excepted and appealed, assigning as error the denial of his motion for judgment of involuntary nonsuit, the exclusion of evidence and certain features of the charge.

*Hofler & Mount and Claude Bittle for plaintiff, appellee.*

*M. Hugh Thompson and Bryant, Lipton, Strayhorn & Bryant for defendant, appellant.*

BOBBITT, J. While plaintiff alleged that "the defendant was negligent in directing plaintiff's intestate to weld upon an automobile in a a small enclosed shed which had inadequate room or ventilation," and further alleged that defendant was negligent "in his failure to assist the plaintiff's intestate in extinguishing his flaming clothing which resulted from the explosion," the evidence is insufficient to support either of these allegations.

Decision, in relation to judgment of nonsuit, turns upon the sufficiency of the evidence to support these allegations: "That the paint can which the defendant filled with water and threw upon the small blaze on the upholstery of the door post on which the deceased was working contained about two inches of gasoline which the defendant did not remove; . . . that the defendant knew or had reason to know that the paint can which he filled with water and threw the contents upon the blaze as aforesaid was used for the purpose of washing automobile parts in gasoline and that any liquid which it contained would in all probability be gasoline; . . . that the defendant was . . . negligent in his failure to remove the gasoline from the paint can before filling it

with water and throwing it upon the small blaze near the plaintiff's intestate."

Actionable negligence embraces negligence and proximate cause. The elements of each have been clearly defined. *Ramsbottom v. R. R.*, 138 N.C. 38, 41, 50 S.E. 448; *Hall v. Coble Dairies*, 234 N.C. 206, 67 S.E. 2d 63. There is no controversy as to these well established rules. The controversy concerns their application to the facts of this case.

In determining its sufficiency for submission to the jury, the evidence, whether offered by plaintiff or by defendant, must be considered in the light most favorable to plaintiff. *Singletary v. Nixon*, 239 N.C. 634, 80 S.E. 2d 676. If any part of defendant's evidence is more favorable to plaintiff than that offered by him, plaintiff is entitled to the benefit thereof. *Marshburn v. Patterson*, 241 N.C. 441, 85 S.E. 2d 683.

"The law imposes upon every person who enters upon an active course of conduct the positive duty to exercise ordinary care to protect others from harm, and calls a violation of that duty negligence." *Ervin, J.*, in *Council v. Dickerson's, Inc.*, 233 N.C. 472, 64 S.E. 2d 551; Prosser on Torts, sec. 32(a).

If defendant knew that the can contained any quantity of gasoline, his act in filling the can and throwing the mixture upon the fire would constitute negligence. It is plain from all the evidence that he acted upon the assumption and in the mistaken belief that the liquid in the can when he picked it up was water. The crux of the matter is whether defendant, the proprietor of the garage and body shop premises, should reasonably have anticipated that the liquid he saw in the can was or might have been gasoline or other explosive or inflammable liquid and whether his failure to pour out the liquid that he saw in the can or his failure to inspect it to find out what it was constituted a failure on his part to use due care under all the circumstances.

According to the testimony of plaintiff's witnesses, defendant, in his statements to them shortly after the fire, did not identify any particular can as the one he had grabbed. Esther Williamson's testimony tends to show that up until 5 May, 1952, a square 5-gallon can with the top cut out had been used for water in which to soak sandpaper. She testified also, as set forth above, that there were some 50 empty cans of various sizes around the garage premises.

Defendant's evidence tends to show that the particular can he grabbed was one that he had used in the body shop for ten years for water in which to soak sandpaper. But, while the several defense witnesses were in accord in their testimony that the can grabbed by defendant was one used for water-sandpaper, testimony of these witnesses differs materially, as set forth above, as to the kind, size and location of

the can grabbed or picked up by defendant. Defendant alone refers to seeing sandpaper in the bottom of the can picked up by him.

The testimony of Lane tends to show that gasoline was used for washing automobile parts in the garage. Indeed, it is a matter of common knowledge that in and around a garage and body shop, the use of gasoline and paint thinner is necessary and customary.

The inference is permissible that there were different cans in and about defendant's premises; and that the contents of each can, in the absence of inspection, were known only by the person last using it or by one who observed such use. Of course, the jury could have accepted the defendant's testimony as to the identity of the particular can and its use exclusively as a container in which to soak sandpaper in water; but we do not think the evidence was such that no other reasonable inference or conclusion could be drawn therefrom.

Defendant relies upon *Mills v. Waters*, 235 N.C. 424, 70 S.E. 2d 11, where a judgment of involuntary nonsuit was affirmed. The principles of law declared therein are sound and well established. But the decision is based on facts essentially different and so does not control decision here. It is not contended here that defendant was negligent in attempting to put out the fire, but that he used for this purpose a can containing a liquid without exercising due care to ascertain the contents thereof. To paraphrase: "What it was . . . was gasoline." The evidence tends to show that plaintiff's injuries did not result from the original fire on the upholstery, but were caused by the explosion which resulted from defendant's conduct.

We are constrained to hold that, when considered in the light most favorable to plaintiff, the evidence was sufficient to take the case to the jury as to defendant's alleged actionable negligence.

If it is true, as defendant insists, that the particular can used had been used exclusively for water-sandpaper over a long period of time, and that defendant had no knowledge or reason to believe that gasoline had been placed therein, and that he acted when confronted by a sudden emergency caused by no fault on his part, it may be that defendant was entitled to a peremptory instruction predicated upon such facts. But it is for the jury to pass upon the credibility of the witnesses and the weight to be given the evidence tending to establish such facts. We cannot treat them as established simply because defendant offered evidence to that effect.

As to the extent of the original fire, we know that it involved a portion of the upholstery. It appears that, even after the explosion, defendant was able *to beat it out*. Even so, the fire in the customer's car in the body shop, caused by the conduct of defendant's employee, and defendant's responsibility for injury and damage that might result

from such fire, are circumstances such that defendant was entitled to have explained to the jury that negligence on his part was to be determined in relation to an emergency situation of such extent as the jury found to exist, under the principles declared in *Mills v. Waters, supra.*

Bearing upon the first and third (negligence) issues, the court instructed the jury correctly but generally as to the definitions of negligence and proximate cause. He did not relate the law to variant factual situations having support in the evidence. Thereafter, he instructed the jury as to the second (contributory negligence) issue and as to the fourth and fifth (damages) issues.

After concluding the instructions relating to all the issues, and near the end of the charge, the court instructed the jury as follows: "I further instruct you, gentlemen of the jury, that where a person is confronted with and required to act in sudden emergency, which was not created by his own negligence, that such person is not held to the most wise and highest choice of care, but only to that choice of care which a person of ordinary prudence would have made under similar circumstances."

There are few occasions, if any, when a person is held to the *most wise* and *highest choice* of care. Negligence is the failure to exercise that degree of care that an ordinarily prudent person would exercise under the same or similar circumstances and when charged with like duty. But apart from the instruction itself, no application of the principles of law declared in *Mills v. Waters, supra,* was related to any particular issue; and the court failed to instruct the jury, in substance, that if they found that the defendant on this occasion acted under emergency circumstances, as defendant's evidence tended to show, then what constituted due care was to be determined in the light of what an ordinarily prudent person would have done under such emergency circumstances.

Even in the absence of request for special instructions, a failure to charge the law on the substantive features of the case arising on the evidence is prejudicial error. G.S. 1-180; *Barnes v. Caulbourne,* 240 N.C. 721, 83 S.E. 2d 898, and cases cited. In this case, since defendant relied in large measure upon what he contended were circumstances of acute emergency, the failure to comply with G.S. 1-180 by applying the applicable legal principles to defendant's evidence in regard thereto must be regarded as prejudicial. Hence, defendant's assignment of error relating to this feature of the charge is sustained and a new trial awarded.

This sequence of events is noteworthy: Zollie Williamson was burned on June 4th and died on June 17th; on July 3rd his widow, Esther Williamson, married one Thomas Farrington; on July 9th she qualified as

administratrix under the name of Esther Williamson and under that name brought this action as administratrix. When asked why she qualified as administratrix under the name of Esther Williamson rather than Esther Farrington, she replied: "I signed it that way for the sake of Zollie." Although disinclined to weaken this thread of loyalty to the memory of her late husband, the use of the Williamson rather than the Farrington surname in qualifying as administratrix and in bringing this action, thus obscuring to some extent her then status, is not commended as an example worthy of emulation.

Questions posed by other assignments of error may not arise when the case is tried again.

New trial.