DOROTHY V. GILREATH, ADMINISTRATRIX OF THE ESTATE OF FRANK GILREATH, JR., DECEASED, v. JERRY SILVERMAN.

(Filed 21 November, 1956.)

**1. Boating § 2—**

Evidence of the negligent operation of a motor boat causing a passenger to be thrown therefrom and drowned, *held* sufficient, when considered in the light most favorable to plaintiff, to take the issue to the jury.

**2. Negligence § 19c—**

When there is conflict in the evidence as to the pertinent facts bearing on the issue of contributory negligence, nonsuit on that ground is error.

**3. Trial § 22c—**

Discrepancies and contradictions, even in plaintiff's evidence, are for the jury and not the court.

**4. Boating § 2: Automobiles § 50—**

The doctrine of joint enterprise does not apply as to the liability between the operator of a vehicle and a passenger, but applies only in regard to third persons not parties to the enterprise.

**5. Boating § 2: Negligence § 10½—**

The doctrine of assumption of risk is not available as a defense when there is no contractual relationship between the parties.

JOHNSON, J., not sitting.

APPEAL by plaintiff from *Froneberger, J.,* April Term, 1956, of BUNCOMBE.

This is a civil action instituted on 6 June 1955 to recover damages for the alleged wrongful death of Frank Gilreath, Jr., on 5 March 1955. Dorothy V. Gilreath is the duly appointed and acting administratrix of the estate of Frank Gilreath, Jr., deceased.

Plaintiff's intestate, Frank Gilreath, Jr., came to his death by drowning in Lake Lure on Saturday, 5 March 1955, about 5:00 p.m., after falling from a motor boat occupied at said time by the defendant Jerry Silverman, Howard Wolfe, and the deceased. The three men had on the previous Wednesday been together at the place where Wolfe and Gilreath were employed. Both Wolfe and Gilreath were mechanics. Wolfe suggested to the defendant Silverman that they get Silverman's boat tuned up for the season. Silverman agreed to go the next Saturday afternoon, at Wolfe's time off. Gilreath, who was present at the time of the conversation, voluntarily requested to be permitted to go along. It was agreed.

The next Saturday afternoon Wolfe drove his own car to Lake Lure and Silverman took Gilreath. The men worked on the boat. After getting it in shape to run, they proceeded to operate the boat for the purpose of testing it.

According to Wolfe's testimony at the trial, in making the test, Silverman was back in the motor compartment at the rear of the boat, adjusting the timing or distributor, and he, Wolfe, was operating the boat, running at maximum speed. Silverman was moving the distributor while he was reading the instrument panel to get the highest reading on the instrument while the boat was in operation as they were going down the lake. They had completed that mission. At the time of the accident, the boat was being operated by Wolfe at a speed of approximately 30 miles per hour; the lake was choppy, there was quite a bit of wind, white caps were breaking. The boat in the choppy water had been bumping along, a little rough, "like running over a crosstie with an automobile." According to this witness, after the testing had been completed, Gilreath and Silverman sat down on the back of the seat in which Wolfe was sitting. The back of the seat was about 10 inches wide; Gilreath next to Wolfe and Silverman on the outside. Wolfe saw a boat come out some two or three hundred yards down the lake. The boat operated by Wolfe was near the center of the lake. The wind was blowing toward them. "I was still concentrating on the instrument . . . and on the very last glance I looked up, the boat, . . . going up in the front it is a little hard to see directly over the front—I in turn saw some waves, pretty rough to me, coming rolling—of course we were going slightly parallel to it, so I, in turn, made a right turn to hit the wave crossways instead of lengthwise, instead of alongside . . . in the process of our turn to head onto (*sic*) the wave straight along, . . . we hit the wave on the right side of the boat, and it, in turn, . . . gave a couple of bounces and off they both went, just that quick, so I stopped the boat as quick as I could, turned completely around to the scene, and that is it, right there, is the way I know it. I have been on the lake

propelling a boat practically every season for the past ten or twelve years. I have been working with motors since 1930."

This witness was asked the following questions: "Mr. Wolfe, based on your approximately ten seasons of driving motor boats on Lake Lure, which you have described to his Honor and the jury, and based on your many years of experience with motors, and based on the condition of the waves on Lake Lure, and the winds as you have testified to on March 5, 1955, in the afternoon, do you have an opinion satisfactory to yourself as to whether or not the rate of speed you have described, and the condition of the lake at that time, was safe driving at that speed?" The attorney examining the witness tried to get the witness to say whether or not he had an opinion as to whether or not the speed he was making was safe under the conditions then existing. Finally, he asked the witness the following questions: "Then you do have an opinion, do you?" The witness replied, "Yes, I would, in that particular spot it would be rough, and reckless, yes, sir." Q: "At the time of the fatal accident?" A: "Right at that moment it would be."

Mr. Fred Crowe, coroner of Rutherford County, testified that pursuant to information received by him he went to Lake Lure on 5 March 1955; that he had occasion to talk with Silverman and Wolfe. Silverman stated he was the owner of the boat in which he, Wolfe and Gilreath were passengers on Lake Lure; that the boat in which they were riding was driven by a 115 horsepower motor. "That they were going at a high rate of speed on the lake at the time this accident happened; that the late Mr. Gilreath was sitting up in the boat towards the back and that when the boat lunged forward Mr. Gilreath toppled from the boat along with Mr. Silverman and that Mr. Wolfe, the driver of the boat, went up the lake a short distance, turned around and Mr. Silverman caught on to the side of the boat, and in the meantime Mr. Gilreath had disappeared from the surface of the water." This witness further testified that Wolfe stated, in the presence of Silverman, that the boat was being driven at a high rate of speed at the time of the accident, and that Wolfe also stated, in the presence of Silverman, that he was operating the boat at the direction of Silverman.

At the close of plaintiff's evidence, the defendant made a motion for judgment as of nonsuit. Motion was allowed and the plaintiff appeals, assigning error.

*James S. Howell and William J. Cocke for plaintiff.*
*Harkins, Van Winkle, Walton & Buck for defendant.*

DENNY, J. A careful consideration of the evidence adduced in the trial below leads us to the conclusion that it is sufficient, when considered in the light most favorable to the plaintiff, as it must be on a

motion for nonsuit, to take the case to the jury. *Williamson v. Clay,* 243 N.C. 337, 90 S.E. 2d 727; *Singletary v. Nixon,* 239 N.C. 634, 80 S.E. 2d 676; *Winfield v. Smith,* 230 N.C. 392, 53 S.E. 2d 251; *Thomas v. Motor Lines,* 230 N.C. 122, 52 S.E. 2d 377. Nor will nonsuit be allowed on the grounds of contributory negligence where there is a conflict of evidence, as there is in the instant case, as to the pertinent facts bearing on that issue. *Levy v. Aluminum Co.,* 232 N.C. 158, 59 S.E. 2d 632; *Bundy v. Powell,* 229 N.C. 707, 51 S.E. 2d 307; *Hayes v. Telegraph Co.,* 211 N.C. 192, 189 S.E. 499.

"Discrepancies and contradictions, even in plaintiff's evidence, are for the twelve and not for the court." *Barlow v. Bus Lines,* 229 N.C. 382, 49 S.E. 2d 793, and cited cases.

We refrain from a discussion of the evidence so as not to prejudice either party on the further hearing. We do point out, however, that the allegations in the defendant's further answer and defense, in which the defendant pleads that the plaintiff's intestate together with Howard. Wolfe and the defendant were at the time complained of engaged in a joint enterprise and, therefore, any negligence with respect to the operation of the boat is in law imputed to plaintiff's intestate and constitutes a bar to any recovery in the action, are not well founded.

In Am. Jur., Negligence, section 238, page 925, it is said: "The doctrine of joint enterprise whereby the negligence of one member of the enterprise is imputable to others, resting as it does upon the relationship of agency of one for the other, does not apply in actions between members of the joint enterprise and does not, therefore, prevent one member of the enterprise from holding another liable for personal injuries inflicted by the latter's negligence in the prosecution of the enterprise. In other words, the doctrine of common or joint enterprise as a defense is applicable only as regards third persons and not parties to the enterprise." *Rollison v. Hicks,* 233 N.C. 99, 63 S.E. 2d 190.

The appellee also alleges that the plaintiff's intestate assumed the risk and hazard which brought about his death and argues that such assumption of risk and his contributory negligence constitute a bar to any recovery in this action.

The doctrine of assumption of risk is not available as a defense where there is no contractual relationship between the parties. *Goode v. Barton,* 238 N.C. 492, 78 S.E. 2d 398; *Broughton v. Oil Co.,* 201 N.C. 282, 159 S.E. 321.

The judgment of the court below is
Reversed.

JOHNSON, J., not sitting.