## DORA BETTY BELL v. LEROY SIMMONS.

(Filed 10 January, 1958.)

**1. Appeal and Error § 51—**

In passing upon appellant's exception to involuntary nonsuit, evidence admitted at the trial, whether competent or incompetent, must be considered.

**2. Trial § 22c—**

Discrepancies and contradictions, even in plaintiff's evidence, are to be resolved by the jury and not the court.

**3. Libel and Slander § 1—**

Good faith is no defense to the recovery of compensatory damages for libel.

**4. Same—**

A person giving verbal statements to reporters for the purpose of having the statements published in a newspaper is liable to the extent that libelous matter contained in the article is predicated in sense and substance on such statements.

**5. Libel and Slander § 4—**

It is for the court to determine whether a communication is capable of a defamatory meaning and for the jury to determine whether it was understood in its defamatory meaning by the public.

**6. Libel and Slander § 12—Evidence held for jury as to whether libel tended to injure plaintiff in her occupation or profession.**

Plaintiff was employed as the treasurer and office manager of a corporation and, as extra or incidental employment, was secretary-treasurer of an affiliated organization. Plaintiff's evidence was to the effect that defendant made statements to newspaper reporters for the purpose of publication, that the article published contained matter based on defendant's statements, which, in effect, charged that important records of the organization in plaintiff's custody were missing without explanation, that the sheriff had been called to investigate the matter of the missing records, and that payments due by the organization had not been made because of the loss of the records. *Held:*

BELL *v.* SIMMONS.

The evidence was sufficient to overrule defendant's motion to nonsuit as establishing the publication of words tending to injure plaintiff in her trade or profession.

HIGGINS, J., dissenting.

APPEAL by plaintiff from *Phillips, J.,* March Term, 1957, of DUPLIN.

Action to recover compensatory and punitive damages for alleged defamatory statements of and concerning the plaintiff, alleged to have been made by defendant to one Paul Barwick, a local correspondent, and by telephone to one Charles Clay, a Raleigh reporter, incorporated in an article published in the News & Observer in its issue of October 13, 1955, under a Kenansville dateline of October 12, 1955.

The newspaper article, as alleged in the complaint, was in these words, viz.:

## "FARM BUREAU RECORDS MISSING FROM DUPLIN COUNTY ASC OFFICE

"The mystery has thickened at the Duplin County office of the Agricultural Conservation and Stabilization agency with the discovery that virtually all records of the Duplin Farm Bureau are missing from that office.

"The discovery was made when Farm Bureau President LeRoy Simmons went to the office to find out why home demonstration club members hadn't been paid for work in last year's membership drive.

"Simmons said Harvey D. Arnold of Rose Hill, suspended Chairman of the Duplin ASC Committee, was at the office and advised him to 'keep it quiet.'

"Simmons, who lives at Albertson, said he didn't take the advice because he thinks public matters should be kept 'above board' and the records 'are essential to us and they're valuable to us.'

"The records also would be valuable to a political faction at this time with the hottest ASC election in the history of Duplin coming up next week.

"Without an ASC committee for some time now since an investigation of alleged irregularities in the office's operations began, Arnold and other suspended members of the Committee reportedly are working to get re-elected.

"Horace Godfrey of Raleigh, State ASC Chairman, has said the committee would be removed if the probe substantiates the charges. Whether any findings would be known before the election on October 18 remained to be seen.

"The shocker to Simmons, he said tonight, was that the records had been missing for some time and he still wouldn't know about it if he hadn't 'stumbled on it' October 3.

"Simmons said he went to see Mrs. Dora Betty Bell—who has the dual role of office manager for the ASC and Secretary-Treasurer of the Farm Bureau—when he learned that the club women hadn't been paid the $10 they were due last December for each 50 members they signed up in the Farm Bureau last year.

"Simmons said Mrs. Bell was reluctant to give him the records or a reason why the club members hadn't been paid. When he pressed the matter, Mrs. Bell said the solicitors hadn't been paid because she had no records, Simmons said.

"Simmons said that so far as he has learned no money is missing. He said the money due the drive workers is in the bureau's treasury, and they are now being paid.

"The office, located in the Agricultural Building here, was not broken into and at least $120 in ASC money was untouched.

"The missing records include, along with the list of people who had helped to write Farm Bureau memberships, a check book and financial statements of the past. Only a few scattered sheets of the records were left, Simmons said.

"Simmons said he had been asked by political candidates for Farm Bureau lists but that he had 'never given them to any political figure or anybody else who wanted them for a mailing list.'

"A Farm Bureau committee composed of Simmons, Eugene Carlton of Magnolia, Taft Herring of the Scott's Store section and Arthur Whitfield of Kenansville turned the matter over to Sheriff Ralph Miller today.

"Simmons said today that the club women 'should have been paid last December and I thought they had.' The fact that they hadn't, he indicated, accounted for 'only a handful' of people at a kick-off meeting recently for this year's membership campaign.

"In reference to Arnold's advice on the records, Simmons said he was 'going to cut wood and let the chips fall where they may.' He said he couldn't understand why he, as president of the bureau, wasn't informed about the loss of the record."

Plaintiff alleged, by way of *innuendo,* that said article, which defendant caused to be so published, was intended to charge plaintiff and did charge her with serious wrongdoing, including criminal conduct, as specified in nine separate paragraphs.

Plaintiff alleged that defendant's alleged wrongful conduct caused her to suffer a great nervous shock, causing her to be incapacitated and hospitalized for several weeks, to incur medical and hospital expense of about $500.00, humiliation, mental anguish, damage to reputation, etc.

At the close of plaintiff's evidence, the court entered judgment of involuntary nonsuit. Plaintiff excepted and appealed.

*H. E. Phillips, Norwood Boney and Albion Dunn for plaintiff, appellant.*
*Johnson & Johnson and Jones, Reed & Griffin for defendant, appellee.*

BOBBITT, J. There was evidence which, taken in the light most favorable to plaintiff, tended to show the facts narrated below.

Plaintiff, since 1943, had been treasurer of the Agricultural Stabilization Corporation (ASC) in Duplin County. Its office was in the County Agriculture Building. Since 1952, she had been office manager. ASC paid her a salary of $5,100.00 per year.

Since 1945, plaintiff had been Secretary-Treasurer of the Farm Bureau in Duplin County. During this period she had received and disbursed Farm Bureau funds in the total amount of $31,807.30. She received no stipulated compensation from the Farm Bureau. From time to time, she received "a token of appreciation," or "a Christmas present." The last such present or payment was received on January 13, 1953; and the total received by her over the period of approximately eleven years was $600.00.

The Farm Bureau had no separate office. Plaintiff performed her services for it, "on the side," in the ASC office, and "on nights and on Saturdays after office work."

Defendant, for some four or five years, had been President of the Farm Bureau in Duplin County.

Prior to October, 1955, the three members of the Duplin County ASC Committee had been suspended. Prior to October 13, 1955, the News and Observer "had carried various stories . . . about an investigation of the office by the State ASC Committee." Whatever the alleged reason for said suspension of the committee members, plaintiff was not affected thereby. She continued as secretary-treasurer and office manager until November 1, 1956, when, on account of her impaired health, she resigned. It is noted that the suspended (ASC) committee members were re-elected.

Shortly prior to October 12, 1955, according to Barwick, defendant told him that "soon he would have a red-hot news story for us." On October 12, 1955, late in the afternoon, defendant talked with Barwick in the office of the Duplin Times, Kenansville. Barwick, having made a memorandum of the conversation, telephoned Clay and passed on to Clay what defendant had told him. At Clay's request, defendant was called to the phone; and then Clay and defendant conversed. Thereafter, Clay wrote the article but not the caption.

It appears that defendant asked Clay "not to bring the other issue (ASC) into the Farm Bureau Issue." It appears also that portions of the published article were based on information obtained otherwise than from defendant; also, that certain words and phrases, such as "the mystery has thickened," and "the shocker," are interpretations of what defendant said rather than exact statements made by defendant. Even so, enough remains, based on statements attributed to defendant, to permit these inferences: (1) that plaintiff should have, but did not, pay certain club women the ten dollars to which they were entitled the preceding December for each fifty members they had signed up in the Farm Bureau in 1954; (2) that plaintiff, when pressed for an explanation, stated that she had not done so because she had no records; (3) that Farm Bureau records had been missing for some time, a fact defendant was surprised to learn on October 3rd when he "stumbled on it"; (4) that important records of the Farm Bureau, which should have been in plaintiff's custody, were missing, without explanation; and (5) that the sheriff was called in to investigate the matter of the missing records.

Also, there was evidence that the last paragraph of the published article was to the effect that "Simmons also said that Mrs. Bell who lives near Mount Olive, N. C., will be relieved of her duties with the Farm Bureau." The said paragraph does not appear in the portion of the complaint purporting to quote the published article. But this evidence, whether competent or incompetent, must be considered in passing on defendant's motion for nonsuit. *Kientz v. Carlton,* 245 N.C. 236, 246, 96 S.E. 2d 14, and cases cited.

We refrain from discussing the evidence in detail. Suffice to say, plaintiff's evidence is to the effect that no Farm Bureau or other records were or are missing. Her testimony tends to dispel any suggestion of neglect or wrongful conduct on her part.

It appears that the ASC office had been entered early in 1955, at which time a small desk drawer in which plaintiff kept records, including certain records of the Farm Bureau, had

been prized open; that plaintiff promptly reported this to the ASC people; but that, since nothing relating to the Farm Bureau was missing or affected, she did not report it to defendant. The evidence tends to show that the sheriff was called in, when the Farm Bureau people learned of this incident, to investigate the said entry and opening of the desk drawer, not to investigate or to search for missing records. It appears further that the sheriff had no information on which to conduct and did not attempt to conduct any investigation. However, a person reading the published article did not have the benefit of this information.

Defendant, on adverse examination, testified that all he told Barwick and Clay as to missing Farm Bureau records was what plaintiff had told him; and Barwick and Clay testified that defendant so stated to them. However, as to this, the evidence of plaintiff is directly in conflict, both as to the actual facts and as to what she told defendant. True, plaintiff offered in evidence the testimony given by defendant on adverse examination; but discrepancies and contradictions in the evidence, even though such occur in the evidence offered in behalf of plaintiff, are to be resolved by the jury, not by the court. *White v. Lacey,* 245 N.C. 364, 96 S.E. 2d 1; *Gilreath v. Silverman,* 245 N.C. 51, 95 S.E. 2d 107; *Cozart v. Hudson,* 239 N.C. 279, 78 S.E. 2d 881.

The evidence is susceptible of the interpretation that defendant acted in good faith in providing the data for the published article and in the honest belief that he conceived it his duty to make public what he had "discovered," even though he may have acted impulsively and under misapprehension of the facts. But evidence as to good faith, etc., is not determinative as to plaintiff's right to recover compensatory damages. *Ivie v. King,* 167 N.C. 174, 83 S.E. 339; *Fields v. Bynum,* 156 N.C. 413, 72 S.E. 449.

It is noted that plaintiff both alleged and offered evidence tending to show that she had suffered special damages, to wit, illness sufficient to require medical and hospital care and expense.

In *Flake v. News Co.,* 212 N.C. 780, 195 S.E. 55, it is stated by *Barnhill, J. (later C. J.)* that a publication is actionable *per se,* "if, when considered alone without *innuendo:* . . . (3) it tends to subject one to ridicule, contempt, or disgrace, or (4) it tends to impeach one in his trade or profession," citing authorities. The published article, when restricted to the statements attributed by plaintiff's evidence to defendant, contains defamatory language within the scope of both (3) and (4). See *Kindley v. Privette,* 241 N.C. 140, 84 S.E. 2d 660, and cases cited.

*Devin, C. J.,* citing numerous authorities, states this general rule: "It is well settled that all who take part in the publication of a libel or who procure or command libelous matter to be published may be sued by the person defamed either jointly or severally." *Taylor v. Press Co.,* 237 N.C. 551, 75 S.E. 2d 528, where the alleged libelous matter was in a newspaper advertisement published in the exact language of the individual who procured and paid for its publication.

As to whether the evidence is sufficient to support an action for libel as distinguished from slander, there is ample evidence that defendant's statements to Barwick and Clay were made, not only with knowledge that they would be made the basis of a newspaper article but that defendant made the statements for that purpose.

In Prosser, Law of Torts, Second Edition, Sec. 94, the author makes this statement: "There may be responsibility for publication by another, as in the case of defamation published by an agent within the scope of his authority, or an express or implied authorization to publish, as where a statement is made to a newspaper reporter." However, as the author points out, the rule is otherwise when there is no authorization to publish.

The published article can be considered libelous as to defendant only to the extent it contains false and defamatory matter predicated in sense and in substance on statements made by defendant for publication.

The rule has been stated as follows: "The fact that the defamatory words are spoken with the intention that they be embodied forthwith in a physical form makes the speaking of them not only the publication of a slander, but a libel as well provided they subsequently are so embodied. On the other hand, if defamatory words are spoken which the defamer intends to be reduced to writing, he has published a slander and not a libel if they are not so reduced. His intention that the defamatory statement be embodied in a written form is not alone enough to make him the publisher of a libel if in fact the statement is not so embodied but is repeated only by word of mouth." Restatement of the Law of Torts, Sec. 577f.

In *Klos v. Zahorik,* 113 Iowa 161, 84 N.W. 1046, an article written by defendant was rewritten by the newspaper before publication. The opinion contains the following: "And it is too plain to require extended comment that, if the communication from defendant to the paper was in itself unobjectionable, then defendant could not be held liable for improper matter contained in the newspaper article, even though the article might have been to some extent instigated by or based upon defendant's communication."

While we do not think the published article, either in its entirety or in respect of the portions thereof attributed by plaintiff's evidence to statements made by defendant, may be fairly interpreted to charge wrongdoing on the part of plaintiff to the full extent alleged by way of *innuendo,* we are of the opinion that it does charge conduct from which unfitness for a position such as secretary-treasurer of the Farm Bureau may be implied. It is noted: "(1) The court determines whether a communication is capable of a defamatory meaning. (2) The jury determines whether a communication, capable of a defamatory meaning, was so understood by its recipient." Restatement of the Law of Torts, Sec. 614.

While plaintiff's employment by the Farm Bureau seems to have been an extra or incidental employment, it must be remembered that her principal occupation, that of secretary-treasurer and office manager of ASC, a position in which she had served for many years, involved responsibilities different in extent but of like kind. In such occupation, which was her established means of livelihood, the care and custody of records was a primary responsibility.

"Where the words used have such a relation to the profession or occupation of the plaintiff that they directly tend to injure him in respect to it, or to impair confidence in his character or ability, when from the nature of his business great confidence must necessarily be reposed, they are actionable, . . ." 33 Am. Jur., Libel and Slander Sec. 64; 53 C.J.S., Libel and Slander Sec. 32 (b).

Our conclusion is that plaintiff offered evidence sufficient to require submission of her case to the jury. Hence, the judgment of involuntary nonsuit is reversed.

Reversed.

HIGGINS, J., dissenting:

It seems to me that back of this case is a political controversy, and in such matters I think public good demands that they be discussed freely. Of course, the discussion should be honest. Viewed in this light, it occurs to me that the words used do not go beyond the bounds of proper political debate and discussion and are, therefore, not actionable. I vote to affirm.