ROBERT D. OWEN, Plaintiff-Appellant, v. REX CARR *et al.*, Defendants-Appellees.

Fourth District   No. 4—84—0417

Opinion filed May 14, 1985.—Rehearing denied June 13, 1985.

GREEN, P.J., concurring in part and dissenting in part.

Robert D. Owen, *pro se*, and Robert M. Owen, both of Decatur, for appellant.

Heyl, Royster, Voelker & Allen, of Springfield, for appellee Rex Carr.

Dan H. Reuben, James H. Alesia, and Donald A. Vogelsang, all of Reuben & Proctor, of Chicago, and Harold F. Tenney, of Tenney, Tietz & Heavner, of Decatur, for other appellees.

JUSTICE MILLS delivered the opinion of the court:
A question of libel.
More particularly, does the *innocent construction rule* apply?
Yes.
We affirm.
Attorney Robert Owen filed suit in the circuit court alleging that he had been defamed. The named defendant, Rex Carr—also a lawyer—had brought suit on behalf of Judge William Starnes against Owen and Owen's client, International Harvester Company (Harvester), seeking damages for allegedly defamatory charges Owen had made to the Judicial Inquiry Board (JIB) against Starnes.

In the instant case, Owen alleged that (1) Carr had made defamatory statements about Owen in connection with Owen bringing those charges, (2) the remarks were made knowing they would be republished in a nationally circulated law journal, (3) various news media defendants published an article containing the remarks in a nationally circulated law journal, and (4) that the remarks were libelous *per se*. The article was attached to the complaint and made a part of it by reference. Upon motion of Carr and the news media, the trial court dismissed the cause and Owen appeals.

We affirm, concluding the article was reasonably susceptible to an innocent construction.

The complaint alleged that Carr made defamatory statements to David Ranii, a reporter for The National Law Journal (NLJ), which

published the article in question. (See Appendix.) Defendant New York Publishing Company (New York) owned the NLJ. Carr's, Ranii's and New York's motions to dismiss alleged the article was reasonably susceptible to an innocent construction. Alternatively, the motions alleged that various privileges applied.

■ The complaint also alleged that defendant James L. Finkelstein was the publisher of NLJ and vice-president of New York. He appeared only by motion, under special and limited appearance, seeking to quash service of process upon him. The motion was never ruled upon. However, the order from which appeal was taken dismissed and struck the case. We deem that order to be applicable to all parties and, therefore, to be final as to all claims and all parties in the case. Accordingly, the order was a final order within the meaning of article VI, section 6, of the Illinois Constitution of 1970 and Supreme Court Rule 301 (87 Ill. 2d R. 301), which make such orders in civil cases appealable as a matter of right.

■ Finally, the complaint alleged that defendant SFN Companies, Inc., is a holding company which acquired all of the stock in New York in early 1983 and subsequently merged all of New York's business activities into it. SFN's motion to dismiss was based entirely on the failure of the complaint to state a cause of action against it. This motion was meritorious. Defendant was not alleged to have committed any acts which were causitive of any defamation of plaintiff, and there was no allegation of the actual merger of the two corporations. This dismissal as to SFN was proper.

The complaint alleged that the article was published in the NLJ in late October or early November of 1982. The article was titled "Judge Sues Lawyer Who Complained About Him." It compares an earlier lawsuit prosecuted by Carr with the Starnes suit. At issue in the earlier lawsuit, Green v. Alton Telegraph Co. (settled while appeal was pending), was whether allegations in a memorandum submitted to an investigatory agency could serve as the basis of a libel action if subsequent investigation failed to substantiate the allegations. The article quoted Carr as indicating that in both the Green case and the Starnes case a problem existed as to whether the conduct of defendants was privileged. The article also said that Carr had stated that his client needed first to find out what information Owen had given to the Judicial Inquiry Board.

The 10th paragraph of the article stated:

"Judicial inquiries are privileged, but the defendants wrongfully abused that privilege and should be held liable, Mr. Carr claimed. Mr. Owen did not file his complaint in the interest of

justice, but instead was trying deliberately to intimidate Judge Starnes and other judges in future cases involving International Harvester, he said."

The complaint alleged: (1) Carr made the foregoing statements attributed to him knowing they would be republished in a news article; (2) the portion of the statements referring to Owen's reasons for making the complaint was false; and (3) Carr made the statements and the media defendants published either knowing of its falsity or with reckless disregard of its truth.

We note that the complaint alleged that Carr's remarks, which he made to Ranii knowing they would be published, were libelous *per se.* Technically, the oral remarks should have been characterized as slanderous *per se.* However, Illinois law treats the two forms of defamation similarly when the slanderous words fall into the libel *per se* categories. *Catalano v. Pechous* (1978), 69 Ill. App. 3d 797, 805, 387 N.E.2d 714, 721, *aff'd* (1980), 83 Ill. 2d 146, 419 N.E.2d 350; *American Pet Motels, Inc. v. Chicago Veterinary Medical Association* (1982), 106 Ill. App. 3d 626, 629-31, 435 N.E.2d 1297, 1299-1300; *Mitchell v. Peoria Journal-Star, Inc.* (1966), 76 Ill. App. 2d 154, 158-60, 221 N.E.2d 516, 518-20; *Brown & Williamson Tobacco Corp. v. Jacobson* (7th Cir. 1983), 713 F.2d 262, 267.

■■ The innocent construction rule is used in determining if oral statements are defamatory *per se.* (See *Catalano v. Pechous* (1978), 69 Ill. App. 3d 797, 387 N.E.2d 714, *aff'd* (1980), 83 Ill. 2d 146, 419 N.E.2d 350; *Mitchell v. Peoria Journal-Star, Inc.* (1966), 76 Ill. 2d 154, 221 N.E.2d 516.) The article here provides the context of the conversation during which the allegedly defamatory remarks were made.

■■ Additionally, a slanderous statement knowingly made to a newspaper reporter who subsequently incorporates it into a published article takes on the form of libel:

"A publication of a libel may be made by an oral communication that is intended to be, and is, reduced to writing. *** The same is true when a message is telephoned to a telegraph office where it is reduced to writing, or *when a statement is given orally to a newspaper reporter and is published in the paper. In this case the oral communication takes on the character of libel because of the intended and actual embodiment in permanent form.*" (Emphasis added.) (Restatement (Second) of Torts sec. 568, at 181 (1977).)

(See also *Sanborn v. Chronicle Publishing Co.* (1976), 18 Cal. 3d 406, 556 P.2d 764, 134 Cal. Rptr. 402; *Bell v. Simmons* (1958), 247

N.C. 488, 101 S.E.2d 383; *Tallent v. Blake* (N.C. App. 1982), 291 S.E.2d 336; *Newton v. Family Federal Savings & Loan Association* (1980), 48 Or. App. 373, 616 P.2d 1213; *Rand v. New York Times Co.* (1980), 75 App. Div. 417, 430 N.Y.S.2d 271.) The article presents the context of the statement.

The trial court concluded that considering the "innocent construction rule" of *John v. Tribune Co.* (1962), 24 Ill. 2d 437, 181 N.E.2d 105, as clarified and modified by *Chapski v. Copley Press* (1982), 92 Ill. 2d 344, 442 N.E.2d 195, the paragraph in question, taken in conjunction with the entire article, was not defamatory *per se*.

Under common law four classes of words—if falsely communicated—give rise to a cause of action for defamation without a showing of special damages. They are: (1) words imputing a criminal offense, (2) words imputing infection with a loathsome disease, (3) words imputing inability to perform or lack of integrity in performing the duties of one's profession, and (4) words prejudicing the party in his profession. (*Fried v. Jacobson* (1983), 99 Ill. 2d 24, 27, 457 N.E.2d 392, 394.) Owen maintained that the cited words attributed to Carr and published in the NLJ article imputed lack of integrity in the practice of his profession, prejudiced him in his profession, and imputed that he committed the criminal offense of intimidation.

■ The trial court in its order emphasized that the language stating Owen was trying to "intimidate" could reasonably be given an interpretation other than that plaintiff was committing or intending to commit the crime of intimidation. (Ill. Rev. Stat. 1983, ch. 38, par. 12—6.) The court noted that the word itself does not naturally apply to criminal conduct and in common usage has a more flexible meaning. We agree.

However, Owen also alleged Carr's statements imputed lack of professional integrity and prejudiced him in the practice of his profession. The initial step in determining if a statement is defamatory *per se* is to apply the innocent construction rule. This rule was first expressed in *John* where the court stated:

> "That rule holds that the article is to be read as a whole and the words given their natural and obvious meaning, and requires that words allegedly libelous that are capable of being read innocently must be so read and declared nonactionable as a matter of law." (*John v. Tribune Co.* (1962), 24 Ill. 2d 437, 442, 181 N.E.2d 105, 108.)

The *Chapski* court, in modifying the innocent construction doctrine,

concluded that the above language had caused courts to give strained interpretations to allegedly defamatory words and the implications arising from those words. The court also noted that the rule had been applied inconsistently at the appellate level, and a broad interpretation of the rule was no longer as necessary as at the time of *John* because of the expansion of first amendment protection later given to language previously held defamatory. The court then stated:

"We therefore hold that a written or oral statement is to be considered in context, with the words and the implications therefrom given their natural and obvious meaning; if, as so construed, the statement may reasonably be innocently interpreted *** it cannot be actionable *per se.*" *Chapski v. Copley Press* (1982), 92 Ill. 2d 344, 352, 442 N.E.2d 195, 199.

The meaning given allegedly defamatory words is not necessarily plaintiff's interpretation of them, but their ordinary meaning and implication. (*Chapski v. Copley Press* (1982), 92 Ill. 2d 344, 442 N.E.2d 195; *Wade v. Sterling Gazette Co.* (1965), 56 Ill. App. 2d 101, 205 N.E.2d 44.) The headline is considered with the body of the article. (*Chapski v. Copley Press* (1982), 92 Ill. 2d 344, 442 N.E.2d 195; *Wade v. Sterling Gazette Co.* (1965), 56 Ill. App. 2d 101, 205 N.E.2d 44.) The import of the entire article must be considered in determining whether the statement in context may reasonably be interpreted in a nondefamatory manner.

Under *Chapski*, the words and the implications from them, in context, must be considered in determining if the language reasonably implies lack of integrity or prejudices a person in his employment. *Crinkley v. Dow Jones & Co.* (1983), 119 Ill. App. 3d 147, 456 N.E.2d 138.

The initial focus in paragraph 10 is where Carr states that judicial inquiries are privileged but that defendants (Owen and Harvester) wrongfully abused the privilege, and that Owen filed his complaint to intimidate Judge Starnes. Webster's New World Dictionary 738 (2d ed. 1980) defines "intimidate" as: "(1) to make timid; make afraid; overawe. (2) to force or deter with threats or violence; cow ***." Webster's New World Dictionary of Synonyms 461 (1978) states: "Intimidate primarily implies a making timid or fearful, but it often suggests a display or application (as of force or learning) so as to cause fear or a sense of inferiority and a consequent submission ***." Even if we accept the least forceful definition of "intimidate,"—to make timid or afraid—stating an attorney wrongfully used the disciplinary process to make a judge timid or afraid could unfa-

vorably reflect on the attorney's professional integrity or prejudice him in the practice of his profession.

However, under *Chapski*, the paragraph must be considered in the context of the entire article and interpreted in an ordinary sense. The article compared a past case (with a similar issue) to the pending case. In paragraph 3, Carr is reported as "claim[ing]" Owen sent defamatory letters to the Judicial Inquiry Board. The article then compares the situation in the former case with the instant situation. In paragraph 10 Carr is reported again as "claim[ing]" Owen abused the confidentiality privilege in reporting to the Judicial Inquiry Board. In paragraph 12, the article states "in addition to libel, the suit charges ***." Paragraphs 13 through 14 contain Owen's denial of the allegation. And the lawsuit from which the charges arose was a matter of public record.

The entire article speaks in terms of claims, allegations, and of what Carr is trying to prove in the Starnes case. With the headline, it becomes clear that the allegations are what Carr is trying to prove. Carr, an attorney, is presenting his advocate's view of his client's cause of action. The claims are not presented as statements of indisputable fact. They are, in fact, disputed within the article.

■ Additionally, The National Law Journal is not a publication which is commonly read by those inexperienced in legal matters. It is doubtful that a reader with any sophistication and understanding of the adversarial system would not realize that litigation lawyers frequently make claims which are not established at trial by the requisite standard of proof. Therefore, it is highly unlikely that the allegations were accepted or understood as anything other than unproven allegations.

In sum, and considering the article as a whole, we conclude it is reasonably susceptible to an innocent construction and therefore is not defamatory *per se*. The article and words within it can reasonably be construed as an attorney's biased presentation of his client's view of a pending cause of action.

In view of our holding, we need not reach the privilege defenses raised.

Affirmed.

TRAPP, J., concurs.

PRESIDING JUSTICE GREEN, concurring in part and dissenting in part:

I concur only with the decision of the majority to affirm the dismissal of the complaint as to defendant SFN. I dissent from the affirmance of the dismissal as to the other defendants.

The majority properly determines that the statement attributed to Carr in paragraph 10 of the article charges Owen with conduct imputing a lack of integrity in performance of his professional duties. However, it then concludes that, in the context of the entire article, the language of paragraph 10 can be given a reasonable interpretation that Carr was merely stating what the allegations of the complaint were in the suit brought by Judge Starnes against Owen. Accordingly, the majority holds that the conduct attributed to the various defendants cannot be found to be defamatory. I disagree.

The allegations against Carr are that he made an oral statement to Ranii with the knowledge that Ranii would publish the statement. If the intent of the complaint is to charge Carr merely with slander, then, whether the innocent construction rule can be applied to Carr's statement would depend upon the entirety of the statement. As that is not set forth in the complaint, the question was not reached by Carr's motion. If the complaint was intended to allege slander, the complaint was erroneously dismissed as to Carr. However, as stated by the majority, it appears that the intent of the complaint was to charge Carr with libel based upon his having made the statement with knowledge that it would be published. If this is so, the statement must be judged in its published form just as it is in regard to defendants Ranii and NLJ.

I cannot give a reasonable interpretation to paragraph 10 of the article which is not defamatory to Owen. I cannot construe the paragraph as indicating that either Ranii, in writing the article, or, Carr, in talking to Ranii, was merely reciting the nature of the allegations of the complaint.

Paragraph 8 of the article begins with the words: "Mr. Carr said his client, who could not be reached for comment, first learned of the allegation of misconduct when the board notified him ***." This language clearly indicates that the writer was speaking of an interview with Carr and reporting purportedly factual matters related to him by Carr. The balance of paragraph 8 and all of paragraph 9 give further factual background about the lawsuit. Carr's alleged statement in the first sentence in paragraph 10 could be taken as merely his opinion of the case, but the second sentence reports a direct statement by Carr as to Owen's intent and motive in filing the

complaint with the Judicial Inquiry Board. I cannot place this statement in a context of Carr merely explaining to Ranii what Judge Starnes' complaint alleged. The statement in the first sentence of the next paragraph that "[s]imilarly, Mr. Carr alleged in the Alton Telegraph case" does not negate the clear imputation that Carr was making a factual statement to Ranii in speaking of Owen's intent in making the complaint.

The majority determines that the otherwise defamatory nature of a statement attributed to Carr and published by Ranii and NLJ concerning Owen's intent and motive is negated by (1) the statements in the article that Carr's statement is disputed, and (2) the sophistication of NLJ readers. I am unaware of a case which relieves a writer or publisher from responsibility for publishing such a statement by also indicating that others disagree with the statement. While the sophistication of the lawyer-readers of NLJ would tend to make them less likely than others to believe a statement merely because it was published, those same readers would be more likely to understand the distinction between a lawyer stating the contentions of a complaint he had filed on behalf of a client and a lawyer making a flat statement as to the motive and intent of the defendant in that suit in engaging in the conduct out of which the suit arises.

Carr cites only the "innocent construction rule" in support of the action of the circuit court. Ranii and NLJ cite other reasons which, according to them, also justify the dismissal as to them. As the trial court did not pass on these contentions, and they were not discussed by the majority, no extensive discussion is desirable here. The neutral reportage privilege (*Krauss v. Champaign News Gazette, Inc.* (1978), 59 Ill. App. 3d 745, 375 N.E.2d 1362) depends upon the story accurately conveying the information presented. According to Ranii's deposition and affidavit, Carr's statement to him was couched in terms of the matters related to him as being Judge Starnes' position in the case brought by Judge Starnes. Thus, a question of fact existed as to whether the story accurately conveyed the information furnished by Carr. Every other privilege claimed by these media defendants is one that requires that the publication be without malice. I consider malice to have been adequately pleaded.

APPENDIX

Monday, November 1, 1982          THE NATIONAL LAW JOURNAL

# Judge Suing Lawyer Who Complained About Him

BY DAVID RANII

National Law Journal Staff Reporter

EAST ST. LOUIS, Ill., attorney Rex Carr is pursuing a $16.5 million libel case against the International Harvester Co. and its retained counsel that has some striking parallels to his suit against the Alton Telegraph newspaper company — which produced one of the largest libel verdicts in history.

Mr. Carr's latest libel case, filed in Madison County Circuit Court, *Starnes v. International Harvester Co.*, 82L462, also raises the question of whether a lawyer whose confidential complaint sparks an investigation by a state judicial conduct commission can be liable for damages if no evidence of misconduct is found.

The plaintiff, St. Clair County Circuit Judge William B. Starnes, claims that an attorney representing the Chicago-based International Harvester Co., Robert Owen of Decatur, Ill., sent "false and defamatory letters and memoranda" accusing the judge of misconduct to the Illinois Judicial Inquiry Board.

The letters themselves were confidential, but they sparked an investigation into the judge's conduct by the board. Although the board eventually gave the judge "a clean bill of health," his reputation was damaged by publicity surrounding the investigation, Mr. Carr said.

Mr. Carr's earlier libel case, *Green v. Alton Telegraph Co.*, 77-66, concerned a confidential memorandum that two Telegraph reporters wrote and gave to the U.S. Justice Department. The memo linked a contractor with organized crime, but a subsequent government investigation failed to substantiate the allegation. (NLJ, 7-14-80.)

However, the contractor was allegedly denied a bank loan he needed to keep his business viable due to the allegation, and a Madison County Circuit Court jury awarded him $9.4 million. While the case was on appeal, the newspaper settled the suit for $1.4 million. (NLJ, May 24.)

To prove his case against International Harvester, Mr. Carr conceded, he must first learn precisely what information Mr. Owen gave to the Judicial Inquiry Board. The general practice of judicial conduct commissions, including the Illinois board, is to keep all complaints confidential.

Mr. Carr said his client, who could not be reached for comment, first learned of the allegation of misconduct when the board notified him of an investigation in May 1981. The investigation centered on the accusation that Judge Starnes eavesdropped on a jury's deliberation — a criminal offense — in a personal-injury case against International Harvester in which he presided and Mr. Owen represented the company.

(The 1980 case, which involved an explosion of a tractor gas tank, produced a jury verdict of $15 million, which Judge Starnes cut in half. An appellate court later reduced the verdict even further to $1.3 million.)

Judicial inquiries are privileged, but the defendants wrongfully abused that privilege and should be held liable, Mr. Carr claimed. Mr. Owen did not file his complaint in the interest of justice, but instead was trying deliberately to intimidate Judge Starnes and other judges in future cases involving International Harvester, he said.

Similarly, Mr. Carr alleged in the Alton Telegraph case that the reporters supplied the Justice Department with information for the "purpose of getting a story and not for any other reason," he said.

In addition to libel, the suit charges the defendants with slander relating to rumors about the investigation of the judge that circulated in the courthouse.

Mr. Owen said of the suit, "I can't believe that anyone can be sued by a responsible lawyer [for libel and slander] without him knowing what I am supposed to have said." He added: "A libel complaint in Illinois has to be specific."

Mr. Owen, of the firm of Owen, Roberts, Susler & Murphy, P.C., denied the accusation that he filed a complaint in order to intimidate Judge Starnes and other judges. "Every word of that is a falsehood. There is not a word of truth to it," he said.

International Harvester refused to comment on the suit.

A federal grand jury also investigated Judge Starnes' conduct, but brought no charges against him. Mr. Carr originally filed a libel suit on the judge's behalf that complained that Mr. Owen supplied both the Justice Department and the inquiry board with libelous information. However, the judge withdrew that suit after it was removed to federal court.

Last week, a battle over where the current suit — which makes no mention of the Justice Department — should be litigated was resolved in the judge's favor. The suit, which was removed to federal court shortly after the case was filed June 18, was remanded to state court for lack of a federal question.