FRED KRAUSS, Plaintiff-Appellant, v. THE CHAMPAIGN NEWS GAZETTE, INC., Defendant-Appellee.

Fourth District   No. 14598

Opinion filed May 5, 1978.

Hagin Harper and Michael B. McClellan, both of Harper & McClellan, of Champaign, for appellant.

James L. Capel, Jr., of Meyer, Capel, Hirschfeld, Muncy, Jahn & Aldeen, of Champaign, for appellee.

Mr. JUSTICE CRAVEN delivered the opinion of the court:

Plaintiff, Fred Krauss, sued defendant, The Champaign News Gazette, Inc., for libel following the publication of a certain article in the defendant's newspaper. The article[1] focused on alleged drug use by juveniles in the TARGET program, a program which was designed and directed by the plaintiff. Plaintiff alleged that the defendant published the article with actual malice; that the content of the article constituted libel *per se* in that it charged him with incompetence in his profession. Plaintiff asserted several respects in which the article constituted libel *per se* in that it charged him with incompetence in his profession. Plaintiff asserted several respects in which the article purported to injure him in the performance of his profession as a psychologist. We will discuss these in some detail later in the opinion.

■■ The court allowed defendant's motion to dismiss expressing the opinion that the article was not of and concerning the plaintiff and that any specific reference to the plaintiff was capable of innocent construction. We affirm the action of the trial court and the judgment entered by it for the reasons stated by the trial court and for the additional reason that the article clearly comes within the ambit of the privilege of neutral reportage.

A robust and unintimidated press is a necessary ingredient of self-

---

[1] The entire article is attached as APPENDIX "A."

government. Since the ultimate sovereign in this country is an informed citizenry, we must have information available of and about public issues and about public figures upon which to make judgments as to public officials and public programs. We initiate and terminate programs through our chosen representatives based upon some determination of the worth, or lack of it, of those programs. Thus, the doctrine of neutral reportage gives bent to a privilege by the terms of which the press can publish items of information relating to public issues, personalities, or programs which need not be literally accurate. If the journalist believes, reasonably and in good faith, that his story accurately conveys information asserted about a personality or a program, and such assertion is made under circumstances wherein the mere assertion is, in fact, newsworthy, then he need inquire no further. Unless it is shown that the journalist deliberately distorts these statements to launch a personal attack of his own upon the public figure or the program, that which he reports under such circumstance is privileged. An excellent statement of the doctrine is found in *Edwards v. National Audubon Society, Inc.* (2d Cir. 1977), 556 F.2d 113. The statement of Judge Kaufman found there is one with which we are in total agreement, and his observations are most appropriate here. He stated:

"At stake in this case is a fundamental principle. Succinctly stated, when a responsible, prominent organization like the National Audubon Society makes serious charges against a public figure, the First Amendment protects the accurate and disinterested reporting of those charges, regardless of the reporter's private views regarding their validity. *See Time, Inc. v. Pape*, 401 U.S. 279, 91 S. Ct. 633, 28 L. Ed. 2d 45 (1971); *Medina v. Time, Inc.*, 439 F.2d 1129 (1st Cir. 1971). What is newsworthy about such accusations is that they were made. We do not believe that the press may be required under the First Amendment to suppress newsworthy statements merely because it has serious doubts regarding their truth. Nor must the press take up cudgels against dubious charges in order to publish them without fear of liability for defamation. *Cf. Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241, 94 S. Ct. 2831, 41 L. Ed. 2d 730 (1974). The public interest in being fully informed about controversies that often rage around sensitive issues demands that the press be afforded the freedom to report such charges without assuming responsibility for them.

The contours of the press's right of neutral reportage are, of course, defined by the principle that gives life to it. Literal accuracy is not a prerequisite: if we are to enjoy the blessings of a robust and unintimidated press, we must provide immunity from defamation suits where the journalist believes, reasonably and in

good faith, that his report accurately conveys the charges made. *Time, Inc. v. Pape, supra.* It is equally clear, however, that a publisher who in fact espouses or concurs in the charges made by others, or who deliberately distorts these statements to launch a personal attack of his own on a public figure, cannot rely on a privilege of neutral reportage. In such instances he assumes responsibility for the underlying accusations. *See Goldwater v. Ginzburg,* 414 F.2d 324 (2d Cir. 1969), *cert. denied,* 396 U.S. 1049, 90 S. Ct. 701, 24 L. Ed. 2d 695 (1970).

It is clear here, that Devlin reported Audubon's charges fairly and accurately. He did not in any way espouse the Society's accusations: indeed, Devlin published the maligned scientists' outraged reactions in the same article that contained the Society's attack. The *Times* article, in short, was the exemplar of fair and dispassionate reporting of an unfortunate but newsworthy contretemps. Accordingly, we hold that it was privileged under the First Amendment." 556 F.2d 113, 120.

■■ While the action of the trial court can be affirmed for the reasons stated, the action can also be affirmed in that the article complained of can be read to comply with the innocent construction rule announced in *John v. Tribune Co.* (1962), 24 Ill. 2d 437, 181 N.E.2d 105, *cert. denied* (1962), 371 U.S. 877, 9 L. Ed. 2d 114, 83 S. Ct. 148. Thus, the statement in the article that the plaintiff devotes most of his time to public relations need not be given a derogatory connotation and indeed public relations could be a significant part of the program and plaintiff's job. Certainly, if characterizing an insurance salesman as "a lousy agent" can be excused under the doctrine of innocent construction, so then can the assertion in this article that plaintiff has an affinity for public relations. The allegations in the article that few staff members have professional qualifications in no way suggests that plaintiff is lacking in qualifications and must be read with hypersensitivity in order to reach such a conclusion. The same observation can be made with reference to an allegation that one of the staff members had been charged with a serious offense. Such appears to be in no way in derogation of plaintiff's program or abilities as a manager of the TARGET program.

Finally, the assertion that the article charged plaintiff with knowingly encouraging or permitting the use of drugs in the program is unfounded. We find in our reading of the article no assertion that the plaintiff "knowingly" encouraged or permitted drug use.

The judgment of the circuit court of Champaign County is affirmed.

Judgment affirmed.

MILLS, P. J., and TRAPP, J., concur.

APPENDIX "A"

Sunday, May 2, 1976—THE CHAMPAIGN-URBANA NEWS-GAZETTE—Page 3-A

"DeLaMar: 'Credibly Informed' of TARGET Drug Use

By Ed Borman of the News-Gazette

Assistant State's Attorney John R. DeLaMar says he is investigating use of marijuana and drugs at the Champaign County Youth Home, and he said he 'strongly opposes' assignment of juvenile delinquents to the controversial TARGET program there.

DeLaMar said he has been 'credibly informed' that drugs are being brought into the Youth Home by visitors or left on window sills.

He reported he has taken a statement from a TARGET 'student' that drugs are 'very easy to get, provided the right counselor is on duty.'

A girl in her early teens recently described what DeLaMar called 'drug abuse' at TARGET during a closed-door Juvenile Court hearing, and her story is being followed up by prosecutors, he said.

Five Demerits

DeLaMar said the standard TARGET penalty for smoking marijuana—'blowing grass'—is five "demerits," which cancel some of the students' 'privileges,' plus five hours in a 'time out' room, where a youngster is 'supposed to sit and think about what he did wrong.' But he said, 'The kids realize that if they all blow grass, they can't all be put in the "time out" room alone, so it's just a matter of demerits if anything at all is done.'

He said he is investigating a report that one boy recently was beaten up because he wouldn't join other students in smoking marijuana.

He quoted the youngster as saying, 'I didn't blow grass on the outside, and I'm not going to do it here.'

DeLaMar, usually a close-mouthed prosecutor, said he has concluded he has a responsibility to speak out about the problems of TARGET, a program developed by Dr. Fred Krauss, a psychologist, for 'Treatment of Adolescents Requiring Guidance, Education and Training.' Juvenile delinquents are sent to TARGET by the Juvenile Division of the Champaign County Circuit Court.

## Would Detail Criticism

DeLaMar said he would detail his criticism of TARGET to the Youth Services Committee of the Champaign County Board if the committee asks him.

Arthur F. Bartell, Rantoul member of the County Board, Thursday resigned as chairman of the Youth Services Committee after the committee voted to seek an outside agency to make what Bartell said would be the eighth evaluation of TARGET in the last two years.

Floyd Bauman, Champaign member of the board, said, 'That committee has been sitting on a time bomb for a long time, and it's about to go off and blow them sky high.'

DeLaMar said, 'When I came to the state's attorney's office in December 1973, I was pro-TARGET. I spent hours with Dr. Krauss, trying to help him.

'Now, I cannot in good faith even agree, much less recommend, that a youngster go out to the place, and I won't do it. If a kid doesn't have major problems, when he or she goes out there, he or she will have them when she gets out. If kids already have major problems, that's no place for them,' he said.

'Somebody is going to get badly hurt out there, and Champaign County is going to be liable for damages. Those kids are being held in a county facility, pursuant to a court order,' he said.

DeLaMar explained his concern in an interview with the News-Gazette.

He charged that, even though TARGET 'students' have been legally adjudged juvenile delinquents and Chief Probation Officer Del Weatherford is responsible for them, the TARGET staff regards probation officers as 'the enemy,' and 'totally distrusts everyone in the state's attorney's office.'

He also flatly charged the TARGET staff with 'misrepresentations to the court.'

He cited a case in which he said that a boy ran away from TARGET and after he had been missing for 10 days, a TARGET representative appeared before a judge and reported that the youth was 'doing well' in the program.

In another case, he said, a boy ran away and shortly afterward the TARGET people reported to the court that he had successfully completed the program and had been sent home. Neither his probation officer nor other law enforcement officials were aware he was gone until he was picked up for another crime, DeLaMar said.

'Good Candidate'

A prime objective of TARGET is to keep juvenile delinquents from going to state institutions. DeLaMar declared he has established in questioning staff members that, in any case where the state's attorney's office is attempting to have a youngster committed to the Illinois Department of Corrections, it is established policy that TARGET staffers will testify he is a 'good candidate' for Dr. Krauss' program.

In one case, he said, a TARGET representative recommended a boy for the program and then conceded on cross-examination that she did not know he had been convicted of armed robbery.

As a result, he maintained, 16-year-olds convicted of armed robbery are being put into the same program with a 13-year-old with a record of shoplifting. He said 16-year-olds are told they don't have to study at TARGET, because they are not legally required to go to school.

DeLaMar asserted that few TARGET staff members have any professional qualifications, and he said, 'I've established that so often in cross-examination that Judge (Andrew) Stecyk is tired of hearing it.'

TARGET Staff

Three former TARGET staff members are now under indictment for felonies, according to DeLaMar. One of them is Michael Lee Exum, 18, who is scheduled to go on trial Monday on a charge of murdering a University of Illinois student last December. Dr. Krauss said Exum was a part-time janitor at TARGET when he was arrested for murder.

DeLaMar said the counselors work in teams, but members of the teams vary daily because of days off, and there is no continuity or consistency.

'The counseling and the discipline varies from day to day, depending on who's working,' he said.

Including Dr. Krauss at just under $22,000 a year, TARGET has 24 full-time and six part-time employees. Six students currently are in residence.

Although Krauss has a doctor's degree in psychology, 'psychological workups' are seldom done on youngsters at TARGET, DeLaMar maintained. He said a former staff member recently told him Dr. Krauss devotes most of his time to 'public relations.'

'There is virtually no coordination, with, or use of, other agencies in the community,' DeLaMar said.

He said that 'by Dr. Krauss' own figures,' 50.1 per cent of TARGET graduates are arrested for subsequent offenses, and he declared, 'From where I sit in the state's attorney's office, I think that figure is low.' "