DOUGLAS GIST, Plaintiff-Appellant, v. MACON COUNTY SHERIFF'S DEPARTMENT, Defendant (Decatur Herald and Review, a Division of Lee Enterprises, Inc., *et al.*, Defendants-Appellees).

Fourth District   No. 4—95—0979

Argued May 15, 1996.—Opinion filed October 18, 1996.

James A. Martinkus and D. Douglas Aldeen (argued), both of Erwin, Martinkus, Cole & Ansel, Ltd., of Champaign, for appellant.

Deanne F. Jones and Charles C. Hughes (argued), both of Kehart, Shafter, Hughes & Webber, P.C., of Decatur, for appellee Decatur Herald & Review.

Garry E. Davis and Bradley T. Paisley (argued), both of Erickson, Davis, Murphy, Johnson, Griffith & Walsh, of Decatur, for appellee TCI Cablevision of Decatur.

JUSTICE STEIGMANN delivered the opinion of the court:

In March 1995, plaintiff, Douglas Gist, sued defendants, the Decatur Herald and Review (Decatur Herald), TCI Cablevision of Decatur (TCI), and the Macon County Sheriff's Department, for defamation. Plaintiff based his suit on a Crime Stoppers' "Most Wanted Fugitives" flyer which the sheriff's department compiled and the Decatur Herald distributed. TCI produced a television segment based upon this flyer. In August 1995, the trial court granted motions to dismiss filed by the Decatur Herald and the sheriff's department. In November 1995, the court granted TCI's motion to dismiss. Plaintiff appeals, arguing that the trial court erred by granting Decatur Herald's and TCI's motions to dismiss. We affirm.

## I. BACKGROUND

Plaintiff's complaint—which the trial court dismissed—alleged essentially the following. On August 1, 1994, the Macon County

State's Attorney filed a complaint charging plaintiff with burglary to a motor vehicle. On that same day, the trial court issued a warrant for plaintiff's arrest. However, the warrant was never served on plaintiff. On October 26, 1994, plaintiff spoke with someone from the sheriff's department about the outstanding warrant, and a "no-charge" was issued. (Plaintiff's counsel was unable to explain to this court what a "no-charge" is, and we have no independent knowledge of such a creature in the law.)

On October 31, 1994, the Decatur Herald circulated a Crime Stoppers' flyer as an insert in its daily paper. The flyer (appended to this opinion), captioned "Most Wanted Fugitives," featured plaintiff's name, picture, and the charge for which he was wanted, along with similar information concerning others wanted on outstanding warrants. Textual information appears to the right of the pictures, including (1) the prefatory statement "Fugitives featured in this publication are wanted as of October 6, 1994. Warrants must be verified before arrest"; (2) a warning ("**IMPORTANT**: These fugitives should be considered **dangerous** and might possibly be armed"); and (3) the credited source of the information ("This is an official quarterly publication compiled by the Macon County Sheriff's Warrants and Extradition Division with aid from local and state police agencies"). While the parties at oral argument were unable to explain who actually formatted and published the flyer, plaintiff's complaint alleged only that "the Macon County Sheriff's Department printed and distributed over 50,000 copies of the flyer" to be added as an insert in the Decatur Herald. TCI made and aired a television segment based on the flyer.

## II. ANALYSIS

The material in this section is not to be published pursuant to Supreme Court Rule 23. 166 Ill. 2d R. 23.

Although it is somewhat unclear from his brief, plaintiff appears to challenge three separate defamatory statements in the flyer. First, plaintiff asserts as defamatory the statement that, as of October 6, 1994, a warrant existed for his arrest in connection with a charge of burglary to a motor vehicle. Second, he asserts as defamatory the heading of the flyer, "Most Wanted Fugitives." Third, he seems to allege that the warning inside the box on the right side of the flyer, stating "[t]hese fugitives should be considered dangerous and might possibly be armed," defames him. We consider all three statements in reviewing the trial court's decision.

## A. Truth and Protected Opinion as a Defense

The material in this section is not to be published pursuant to Supreme Court Rule 23. 166 Ill. 2d R. 23.

## B. Defense of Substantial Truth

Defendants contend that the trial court's decision was proper because the flyer's statements were substantially true. We agree.

■ In Illinois, an allegedly defamatory statement is not actionable if it is substantially true, even though it is not technically accurate in every detail. *Farnsworth v. Tribune Co.*, 43 Ill. 2d 286, 293, 253 N.E.2d 408, 412 (1969); *Lemons v. Chronicle Publishing Co.*, 253 Ill. App. 3d 888, 890, 625 N.E.2d 789, 791 (1993). While this rule is rooted in the United States Constitution (see *New York Times Co. v. Sullivan*, 376 U.S. 254, 289, 11 L. Ed. 2d 686, 712, 84 S. Ct. 710, 731 (1964) (suggesting that state law requiring literal and complete truth as a defense might violate the first amendment); *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 115 L. Ed. 2d 447, 111 S. Ct. 2419 (1991) (only substantial truth, not literal truth, is required in defense of a defamation action)), it is also logically driven, as "falsehoods which do no *incremental* damage to the plaintiff's reputation do not injure the only interest that the law of defamation protects." (Emphasis in original.) *Haynes v. Alfred A. Knopf, Inc.*, 8 F.3d 1222, 1228 (7th Cir. 1993). Moreover, "[a] fussy insistence upon literal accuracy 'would condemn the press to an arid, dessicated [*sic*] recital of bare facts.'" *Loeb v. Globe Newspaper Co.*, 489 F. Supp. 481, 486 (D. Mass. 1980), quoting *Time, Inc. v. Johnston*, 448 F.2d 378, 384 (4th Cir. 1971).

A defendant bears the burden of establishing the "substantial truth" of his assertions, which he can demonstrate by showing that the "gist" or "sting" of the defamatory material is true. *Lemons*, 253 Ill. App. 3d at 890, 625 N.E.2d at 791. When determining the "gist" or "sting" of allegedly defamatory material, a trial court must "look at the highlight of the article, the pertinent angle of it, and not to items of secondary importance which are inoffensive details, immaterial to the truth of the defamatory statement." *Vachet v. Central Newspapers, Inc.*, 816 F.2d 313, 316 (7th Cir. 1987). While substantial truth is normally a question for the jury, where no reasonable jury could find that substantial truth had not been established, the question is properly one of law, which this court may review *de novo*. See *Haynes*, 8 F.3d at 1228.

■ Here, the essence of the matter is that plaintiff was wanted on an arrest warrant as of October 6, 1994, for burglary to a motor vehicle, which is *entirely true*. That plaintiff "might possibly be armed"

or "should be considered dangerous" or was a "most wanted" fugitive—to the extent the statements can even be considered as applying to plaintiff or asserting facts about him—are all secondary details, immaterial to the truth of the Crime Stoppers flyer. Viewing the three allegedly defamatory statements under the totality of the circumstances, we conclude that the trial court's decision was also proper in light of the "substantial truth" of the flyer.

Our conclusion squares with similar results reached by this court and other courts in similar circumstances. See, *e.g., Lemons*, 253 Ill. App. 3d at 890, 625 N.E.2d at 791 (where the plaintiff was caught shoplifting by store employees and then pulled a knife, newspaper article's statements that employees were "security guards," the plaintiff was convicted of four rather than three offenses, and one employee was "stabbed" as opposed to cutting himself in trying to disarm the plaintiff were of little relevance); *Haynes*, 8 F.3d 1222 (where the plaintiff admitted or it was incontestably established that he drank heavily, lost his job, assaulted a police officer, walked out on his children, and committed bigamy, statements that the plaintiff left his children home alone on some nights, was fired for drinking rather than for being caught with alcohol, and preferred to spend money on his car rather than his children paled by comparison); *Vachet*, 816 F.2d 313 (where the plaintiff admitted being arrested for harboring a fugitive, whether the plaintiff was arrested on a warrant for that charge was an irrelevant detail); *Wilson v. United Press Ass'ns*, 343 Ill. App. 238, 98 N.E.2d 391 (1951) ("gist" or "sting" of a report of a supreme court decision was that the plaintiff, after having been convicted, was granted a new trial, and the newspaper's report that the plaintiff had begun to serve his sentence was immaterial).

## C. Privileges

### 1. *Absolute Privilege as a Defense*

The material in this section is not to be published pursuant to Supreme Court Rule 23. 166 Ill. 2d R. 23.

### 2. *Conditional Privileges*

The Decatur Herald and TCI both assert they were protected by a conditional privilege. We agree.

■ In *Kuwik v. Starmark Star Marketing & Administration, Inc.*, 156 Ill. 2d 16, 27, 619 N.E.2d 129, 134 (1993), our supreme court adopted the Restatement (Second) of Torts approach to determine whether a qualified privilege should be recognized in a given situation. See Restatement (Second) of Torts §§ 593 through 599 (1977). Conditional privileges generally fall into three categories: (1) situa-

tions which involve some interest of the person who publishes the defamatory matter; (2) situations which involve some interest of the person to whom the matter is published or of some third person; and (3) situations which involve a recognized interest of the public. *Kuwik*, 156 Ill. 2d at 29, 619 N.E.2d at 135. A court should look only to the occasion giving rise to the defamation action when determining as a matter of public policy whether the occasion created some recognized duty or interest which makes communication of the defamatory statement in that situation conditionally privileged as a matter of law. *Kuwik*, 156 Ill. 2d at 27, 619 N.E.2d at 134; see *Quinn v. Jewel Food Stores, Inc.*, 276 Ill. App. 3d 861, 871, 658 N.E.2d 1225, 1233 (1995); *Barakat v. Matz*, 271 Ill. App. 3d 662, 668, 648 N.E.2d 1033, 1039 (1995). The defendant bears the burden of demonstrating the existence of a conditional privilege. *Kuwik*, 156 Ill. 2d at 27, 619 N.E.2d at 134.

■ Here both defendants were protected by a conditional privilege. The publication of the Crime Stoppers flyer was conditionally privileged under category three, as a situation which involved a recognized interest of the public. Section 598 of the Restatement (Second) of Torts, entitled "Communication to One Who May Act in the Public Interest," sets forth this privilege:

"An occasion makes a publication conditionally privileged if the circumstances induce a correct or reasonable belief that

(a) there is information that affects a sufficiently important public interest, and

(b) the public interest requires the communication of the defamatory matter to a public officer or a private citizen who is authorized or privileged to take action if the defamatory matter is true."

Restatement (Second) of Torts § 598, at 281 (1977).

Comments *d* and *f* to section 598 of the Restatement (Second) of Torts compel recognition of a conditional privilege for the type of publication at issue in this case. Comment *d* states, "[t]he rule stated in this Section is applicable when any recognized interest of the public is in danger, *including the interest in the prevention of crime and the apprehension of criminals*." (Emphasis added.) Restatement (Second) of Torts § 598, Comment *d*, at 282-83 (1977). Comment *f*, entitled "Communications to private citizen to prevent crime or apprehend criminal," states:

"The privilege stated in this Section affords protection to a private citizen who publishes defamatory matter to a third person even though he is not a law enforcement officer, under circumstances which, if true, would give to the recipient a privilege to act *for the purpose of preventing a crime or of apprehending a*

*criminal or fugitive from justice.*" (Emphasis added.) Restatement (Second) of Torts § 566, Comment *f*, at 283-84 (1977). In light of these comments to the Restatement, we hold that the trial court correctly concluded defendants' publications were conditionally privileged.

■ However, a determination that a qualified privilege exists does not end the inquiry. If a defendant demonstrates the existence of a qualified privilege, the burden then shifts to the plaintiff to demonstrate abuse of the privilege. *Quinn*, 276 Ill. App. 3d at 871, 658 N.E.2d at 1234. Prior to the adoption of the Restatement approach to conditional privileges, a plaintiff could establish abuse of a qualified privilege only by a showing of actual malice, *i.e.*, showing defendant knew the statement to be false or acted in reckless disregard to the truth or falsity of the statement. *Zeinfeld v.. Hayes Freight Lines, Inc.*, 41 Ill. 2d 345, 349-50, 243 N.E.2d 217, 221 (1968). Following the adoption of the Restatement (Second) approach, a plaintiff could additionally establish abuse by showing "any reckless act which shows a disregard for the defamed party's rights, including the failure to properly investigate the truth of the matter, limit the scope of the material, or send the material to only the proper parties." *Kuwik*, 156 Ill. 2d at 30, 619 N.E.2d at 136.

■ Here, the plaintiff has failed to demonstrate how either defendant abused its conditional privilege. Plaintiff set forth no facts tending to show either of the defendants acted in bad faith in circulating the flyer. According to the allegations in the plaintiff's complaint, the sheriff's department printed and distributed the flyer to be inserted in the Decatur Herald, which in turn reasonably relied on the sheriff's department as a source of the compilation. The defendants cannot be expected to verify the existence of each individual outstanding warrant for all fugitives pictured on these flyers; such time-consuming verification procedures would greatly reduce the effectiveness and timeliness of these flyers. The flyer at issue here was limited in its scope; the flyer simply stated that plaintiff was wanted on an outstanding arrest warrant as of October 6, 1994, and noted the charge on which the warrant was based. Further, the timing of the publication was proper because it occurred not long after the most current information was compiled by the sheriff's department. Last, plaintiff's complaint alleges nothing improper regarding the manner in which the communication was made (as an insert in the newspaper), and, given that such programs depend upon the widest possible circulation for their success, it was proper for the public at large to receive the communication.

### 3. *Privilege of Fair and Accurate Summary*

■ Defendants were additionally protected by the privilege which protects fair and accurate summaries of governmental proceedings. Our supreme court first recognized this privilege in *Lulay v. Peoria Journal-Star, Inc.*, 34 Ill. 2d 112, 114-15, 214 N.E.2d 746, 747-48 (1966), which adopted the definition of this privilege as set forth in the first Restatement of Torts:

> "The publication of a report of judicial proceedings, or proceeding of a legislative or administrative body or an executive officer *** or a municipal corporation or of a body empowered by law to perform a public duty is privileged, although it contains matter which is false and defamatory, if it is
>
> (a) accurate and complete or a fair abridgment of such proceedings, and
>
> (b) not made solely for the purpose of causing harm to the person defamed." Restatement of Torts § 611, at 293 (1938).

Thus, under *Lulay*, this privilege is qualified because a plaintiff can defeat it by showing that a defendant made a defamatory statement in the course of reporting governmental proceedings but did so with common law malice.

In *Catalano v. Pechous*, 83 Ill. 2d 146, 167-68, 419 N.E.2d 350, 360-61 (1980), the supreme court modified this privilege in accordance with the Restatement (Second) of Torts. Section 611 of the Restatement (Second) of Torts dropped part (b) from the above definition, and, in a sense, created a "hybrid" privilege: "conditional" in that only those reports of governmental proceedings which are accurate and complete or fair abridgments of the proceedings are privileged; "absolute" in that once the prerequisites of the privilege are met, the privilege cannot be defeated by a showing of malice. See Restatement (Second) of Torts § 611, Comments *a, b,* at 297-98 (1977). Section 611 of the Restatement (Second) of Torts provides as follows:

> "The publication of defamatory matter concerning another in a report of an official action or proceeding *** is privileged if the report is accurate and complete or a fair abridgement of the occurrence reported." Restatement (Second) of Torts § 611, at 297 (1977).

Thus, under the Restatement (Second) approach, actual or common law malice will not defeat the privilege once the prerequisites of the privilege have been met. After noting the privilege is not absolute but "broader in its scope" than traditional qualified privileges, the Restatement (Second) stresses "the interest of the public in having information made available to it as to what occurs in official proceedings and public meetings." Restatement (Second) of Torts § 611, Com-

ment *a*, at 297 (1977). The accuracy of the summary, not the truth or falsity of the information being summarized, is the benchmark of the privilege, because the one reporting on the proceeding or meeting is simply acting as the public eye, reporting information "that any member of the public could have acquired for himself." Restatement (Second) of Torts § 611, Comment *i*, at 301 (1977); see also *Martin v. State Journal-Register*, 244 Ill. App. 3d 955, 965, 612 N.E.2d 1357, 1364 (1993) (noting reporters "serve as conduits through which information flows from the reporters' sources to the public"); W. Keeton, Prosser & Keeton on Torts § 115, at 836 (5th ed. 1984) (the rationale underlying the privilege is that "any member of the public, if he were present, might see and hear for himself [what is contained in a governmental report or stated in governmental proceedings], so that the reporter is merely a substitute for the public eye").

In discussing why malice no longer defeats the privilege, the Restatement (Second) of Torts comments:

"The privilege *** permits a person to publish a report of an official action or proceeding ***, even though the report contains what he knows to be a false and defamatory statement. The constitutional requirement of fault is met in this situation by a showing of fault in failing to do what is reasonably necessary to insure that the report is accurate and complete or a fair abridgment." Restatement (Second) of Torts § 611, Comment *b*, at 298 (1977).

Despite these comments to the Restatement (Second) of Torts, *Catalano* appears to have caused confusion in the appellate courts as to whether actual malice might still be raised to defeat this privilege. See *Brown & Williamson Tobacco Corp. v. Jacobson*, 713 F.2d 262, 272 (7th Cir. 1983) ("Illinois law is in disarray on the question whether actual malice defeats the privilege of fair summary"); *Berkos v. National Broadcasting Co.*, 161 Ill. App. 3d 476, 493, 515 N.E.2d 668, 678 (1987) (citing a variety of appellate court cases reaching opposite conclusions on the issue); Note, *Reports upon Public Proceedings and Documents: Absolutely Protected by Constitutional Privilege*, 1985 U. Ill. L. Rev. 1059, 1080-83 (1985) (discussing and criticizing post-*Catalano* cases permitting a showing of actual malice to overcome the privilege). However, decisions of the United States Supreme Court suggest that a constitutional barrier prevents actual malice from overcoming the privilege. See *Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 43 L. Ed. 2d 328, 95 S. Ct. 1029 (1975) (imposition of liability for the "accurate publication" by the press of information lawfully obtained and available in the public record would be inconsistent with the first and fourteenth amendments); *Smith v. Daily*

*Mail Publishing Co.*, 443 U.S. 97, 103, 61 L. Ed. 2d 399, 405, 99 S. Ct. 2667, 2671 (1979) ("[I]f a newspaper lawfully obtains truthful information about a matter of public significance then state officials may not constitutionally punish publication of the information, absent a need *** of the highest order"). Moreover, other decisions support the conclusion that it is the *accuracy* of the press' report—the degree to which it tracks the material contained in the public record—and not the underlying truth or falsity of the public record itself which forms the basis of the privilege and renders notions of actual malice irrelevant. See *Cox*, 420 U.S. at 492, 43 L. Ed. 2d at 347, 95 S. Ct. at 1044 (noting the responsibility of the news media "to report fully and accurately the proceedings of government"); *Florida Star v. B.J.F.*, 491 U.S. 524, 539, 105 L. Ed. 2d 443, 459, 109 S. Ct. 2603, 2612 (1989) (holding that a newspaper may not be punished for the publication of the name of a rape victim where the name was lawfully obtained from a sheriff's department release and noting that had the defendant newspaper "merely reproduced the news release prepared and released by the [Sheriff's] Department, imposing civil damages would surely violate the First Amendment"); *Time, Inc. v. Firestone*, 424 U.S. 448, 47 L. Ed. 2d 154, 96 S. Ct. 958 (1976) (inaccurate summarizations of public proceedings not protected under *Cox*); *Mathis v. Philadelphia Newspapers, Inc.*, 455 F. Supp. 406, 417 (E.D. Pa. 1978) (for privilege to apply, court must compare complained-of publications not with the events which actually transpired but with what was actually stated in the governmental proceeding or report); *O'Donnell v. Field Enterprises, Inc.*, 145 Ill. App. 3d 1032, 1035-36, 491 N.E.2d 1212, 1215 (1986) (finding privilege applies even where publisher knows statements he is reporting are false); *Martin*, 244 Ill. App. 3d at 965, 612 N.E.2d at 1364 (noting "reporters *do not* and *cannot* guarantee the truth of their stories; instead, they serve as conduits through which information flows from the reporters' sources to the public" (emphasis in original)). This approach makes sense because the privilege is circumscribed by definition—one must either make a complete and accurate report, or, if a summary is made, the summary must be "fair" for the privilege to apply.

■ With these principles in mind, it is clear that the fair summary privilege protects the defendants in the present case because they accurately published information obtainable through public records. An outstanding warrant for plaintiff's arrest did exist as of October 6, 1994. The existence of an arrest warrant is a matter of public record and inherently involves some official action by the judiciary. The flyer was complete and accurate in reporting plaintiff's fugitive status as of October 6, 1994. Even were it not, as discussed

above, the flyer was beyond a doubt substantially true, making the privilege applicable. See Restatement (Second) of Torts § 611, Comment *f*, at 300 (1977) ("substantially correct account of the proceedings" is all that is required to invoke the privilege).

In support of our conclusion, we note that other courts have found this privilege applicable under very similar circumstances. In *Mathis* (455 F. Supp. at 409), two allegedly libelous newspaper articles described the arrest and arraignment of two brothers for kidnapping and bank robbery. Both articles erroneously pictured the plaintiff as one of the two suspects, but the erroneous picture was supplied by the Philadelphia police department. The second article contained a further error. In describing the second arrestee (who had the same name as the plaintiff and in whose place plaintiff's picture appeared), the article gave, as the supposed age and address of the suspect, the age and address of the plaintiff, again based on information supplied by the police. Although neither article credited law enforcement as the source of the information, the misinformation was compiled by the "night command," the official source of information regarding the activities of Philadelphia detectives. *Mathis*, 455 F. Supp. at 416. The *Mathis* court concluded that the police had issued an "informal report" to the press involving the suspects, such that the privilege set out under section 611 of the Restatement (Second) of Torts applied. Comparing the articles with the "informal report" supplied by the police, the court found that the articles were "accurate" and that the privilege could not have been forfeited by simple negligence in failing to discover the truth of the information. *Mathis*, 455 F. Supp. at 416-17.

Likewise, in *Porter v. Guam Publications, Inc.*, 643 F.2d 615 (9th Cir. 1981), the "Police Blotter" section of defendant's newspaper accurately reported, based on a police compilation of criminal complaint and arrest reports, that the plaintiff had been arrested and booked for theft of a motor vehicle and some cash. While true, the police bulletin itself was based on false charges filed by the complainant, and no complaint or arrest warrant was ever issued. *Porter*, 643 F.2d at 616. The *Porter* court reversed a jury verdict in favor of the plaintiff, concluding that defendant's motion for summary judgment should have been granted based on Guam's statutory privilege for "fair and true" reports of "judicial" or "other public official" proceedings. *Porter*, 643 F.2d at 617-18.

### 4. *Privilege of Neutral Reportage*

■ Both defendants here were also protected by the privilege of

neutral reportage, which this court adopted in *Krauss v. Champaign News Gazette, Inc.*, 59 Ill. App. 3d 745, 747, 375 N.E.2d 1362, 1363 (1978). The *Krauss* court, relying on the decision in *Edwards v. National Audubon Society, Inc.*, 556 F.2d 113 (2d Cir. 1977), summarized the privilege as follows:

> "[T]he doctrine of neutral reportage gives bent to a privilege by the terms of which the press can publish items of information relating to public issues, personalities, or programs which need not be literally accurate. If the journalist believes, reasonably and in good faith, that his story accurately conveys information asserted about a personality or a program, and such assertion is made under circumstances wherein the mere assertion is, in fact, newsworthy, then he need inquire no further. Unless it is shown that the journalist deliberately distorts these statements to launch a personal attack of his own upon the public figure or the program, that which he reports under such circumstance is privileged." *Krauss*, 59 Ill. App. 3d at 747, 375 N.E.2d at 1363.

Although the first district has refused to recognize the privilege (see *Newell v. Field Enterprises, Inc.*, 91 Ill. App. 3d 735, 757-58, 415 N.E.2d 434, 451-52 (1980); *Tunney v. American Broadcasting Co.*, 109 Ill. App. 3d 769, 777-78 (1982)), other courts have done so. See, *e.g.*, *Edwards*, 556 F.2d 113; *Cianci v. New Times Publishing Co.*, 639 F.2d 54 (2d Cir. 1980); *Price v. Viking Penguin, Inc.*, 881 F.2d 1426 (8th Cir. 1989), *cert. denied*, 493 U.S. 1036, 107 L. Ed. 2d 774, 110 S. Ct. 757 (1990); *Ryan v. Herald Ass'n*, 152 Vt. 275, 566 A.2d 1316 (1989); *Burns v. Times Argus Ass'n*, 139 Vt. 381, 430 A.2d 773 (1981) (citing privilege with approval in *dicta*); *Herron v. Tribune Publishing Co.*, 108 Wash. 2d 162, 736 P.2d 249 (1987) (*en banc*); *Barry v. Time, Inc.*, 584 F. Supp. 1110 (N.D. Cal. 1984); *Sunshine Sportswear & Electronics, Inc. v. WSOC Television, Inc.*, 738 F. Supp. 1499 (D.S.C. 1989); see also Comment, *Neutral Reportage: The Case for a Statutory Privilege*, 86 Nw. U. L. Rev. 417 (1992) (hereinafter Comment); *cf. Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 694, 105 L. Ed. 2d 562, 593, 109 S. Ct. 2678, 2699 (1989) (Blackmun, J., concurring) (petitioner's failure to assert neutral reportage privilege "unwise"); *contra, e.g., Dickey v. CBS, Inc.*, 583 F.2d 1221 (3d Cir. 1978); *Janklow v. Viking Press*, 378 N.W.2d 875 (S.D. 1985). Our supreme court has not yet addressed this privilege. See *Catalano*, 83 Ill. 2d at 170, 419 N.E.2d at 362. We renew our acceptance of the privilege and conclude that it applies here. We note that plaintiff's complaint contains no assertion that the defendants abused this privilege in the instant matter.

## D. The Innocent Construction Rule

The material in this section is not to be published pursuant to Supreme Court Rule 23. 166 Ill. 2d R. 23.

## III. EPILOGUE

The *fear* of libel litigation alone is potentially a greater threat to freedom of speech than the actual litigation. See *Costello v. Ocean County Observer*, 136 N.J. 594, 605, 643 A.2d 1012, 1018 (1994). As long ago as 1984, Judge Bork noted, "[A] remarkable upsurge in libel actions, accompanied by a startling inflation of damage awards, has threatened to impose a self-censorship on the press which can as effectively inhibit debate and criticism as would overt governmental regulation that the first amendment most certainly would not permit." *Ollman v. Evans*, 750 F.2d 970, 996 (D.C. Cir. 1984) (*en banc*) (Bork, J., concurring, joined by Wilkey, Ginsburg, and MacKinnon, JJ.). While only 10% of libel plaintiffs win their cases, the average monetary judgments against media defendants in these winning cases is a frightening $2 million. Comment, 86 Nw. U. L. Rev. at 444 & n.200 (describing the case of the Alton Telegraph, an Illinois daily newspaper with 35,000 subscribers, which, after having lost a $9.2 million libel suit based on an article *which was never published*, threatened bankruptcy, settled, and was eventually sold). Thus, motions for summary judgment and like motions are exceedingly important tools for disposing of nonmeritorious defamation suits. *Costello*, 136 N.J. at 605, 643 A.2d at 1018; see, *e.g., Porter*, 643 F.2d 615 (jury award of $25,000 in plaintiff's favor in libel action reversed because the defendant's motion for summary judgment should have been granted). Again, as Judge Bork notes, "The only solution to the problem libel actions pose would appear to be close judicial scrutiny to ensure that cases about types of speech and writing essential to a vigorous first amendment do not reach the jury." *Ollman*, 750 F.2d at 996 (Bork, J., concurring, joined by Wilkey, Ginsburg, and MacKinnon, JJ.); see also *Costello v. Capital Cities Communications, Inc.*, 153 Ill. App. 3d 956, 993, 505 N.E.2d 701, 724 (1987) (Steigmann, J., dissenting) (because of danger to first amendment freedoms presented by libel suits, courts must act with "heightened awareness" when ruling in this area). While the writing at issue here was not political speech often thought to be at the core of the first amendment, the media in this type of situation nevertheless perform an invaluable service to both law enforcement and the public at large. Accordingly, we conclude that the trial court's grant of defendants' motions to dismiss in the present case was absolutely proper.

For the reasons stated, we affirm the trial court's judgment.

Affirmed.

COOK, P.J., and KNECHT, J., concur.

**APPENDIX**

# WANTED
BY
## CRIME STOP PERS
**DECATUR AREA CRIME STOPPERS**

APPREHENSION THROUGH CO-OPERATION

The Fugitives featured within this publication are wanted by area law enforcement.
It is believed these suspects are still residing in and around the Macon County Area.

APPREHENSION THROUGH CO-OPERATION

IF YOU HAVE INFORMATION ON THE LOCATION OF THESE FUGITIVES, OR INFORMATION ON ANY OTHER SERIOUS CRIMES, PLEASE CALL

## CRIME STOPPERS    423-TIPS or 423-8477

### REWARD UP TO $1,000.00
### MOST WANTED FUGITIVES

Fugitives featured in this publication are wanted as of October 6, 1994. Warrants must be verified before arrest.

IMPORTANT: These fugitives should be considered dangerous and might possibly be armed.

WARNING: Never confront these subjects by yourself. Call Crime Stoppers.

This is an official quarterly publication compiled by the Macon County Sheriff's Warrants and Extradition Division with aid from local and state police agencies.

This Fugitive Apprehension Program founded by:
Illinois State Police
Macon County Sheriff
Decatur Police Department

For more information about fugitive programs in Illinois contact Illinois State Police Intelligence, Special Agent Shad Edwards at 217-524-5585.

FTA = Failure to Appear

Sponsored by:
Decatur Herald & Review

Watch the Fugitive Segments on TCI Cable Channel 12.

1 JOSH T FLOYD 31
MULTIPLE FELONIES

2 KEVIN L BROWN 24
OBSTRUCTING JUSTICE

3 SUZETTE M PARTON 27
VIOLATION PROBATION, FORGERY

4 JOANNE HUGHES, 26
FIREARM THEFT

5 MARK D BURCHAM, 34
BURGLARY BATTERY ARSON

6 ERNEST E CHISM 28
POSS OF CONTROLLED SUBST

7 LISA GAY JONES, 29
VIO PROBATION, THEFT, FORGERY

8 DIANNA S WHITE 26
AGG BATTERY, THEFT

9 BRANDON M HORNE 23
RESIDENTIAL BURGLARY

10 WALTER WILLIAMS JR, 41
4 CTS ARMED ROBBERY

11 HELEN KAY PROSSER 37
VIO PROBATION THEFT

12 ELAINE CURRY 30
FORGERY

13 DOUGLAS J GIST 31
BURGLARY TO MOTOR VEHICLE

14 BRENT C CRAMER 21
1ST DEGREE MURDER

15 JUDITH ANN PEPKINS 48
VIO PROBATION DEC PRACTICES

16 LEANNA BARKER 36
VIO PROBATION MULTIPLE FELONIES

17 RYAN LESLIE WEST 28
MULT TRAFFIC CRIMINAL FELONIES

18 JAMES F BROWN 26
POSS OF CONTR SUBS, WEAPONS

19 DIANA LEE WALLER 31
VIO PROBATION THEFT

20 MIA M YOUNG, 22
2 CTS POSS WEAPONS BY FELON