# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *Hill v. Schmidt*, 2012 IL App (5th) 110324

---

| | |
|---|---|
| Appellate Court Caption | ANTHONY HILL, Plaintiff-Appellant, v. SANFORD SCHMIDT and ALTON TELEGRAPH, Defendants-Appellees. |
| District & No. | Fifth District<br>Docket No. 5-11-0324 |
| Filed | May 7, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The dismissal of plaintiff's *pro se* complaint alleging defamation and reckless endangerment based on a newspaper article concerning plaintiff's prosecution in a murder case was affirmed where the statements made were protected by the fair-report privilege, they did not constitute defamation *per se* or *per quod*, and plaintiff failed to allege any special damages. |
| Decision Under Review | Appeal from the Circuit Court of Madison County, No. 11-AR-288; the Hon. Thomas W. Chapman, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

Anthony Hill, of Robinson, appellant *pro se*.

Thomas Scott Stewart, of Ogletree, Deakins, Nash, Smoak & Stewart, P.C., of St. Louis, Missouri, and John A. Bussian, of Bussian Law Firm, of Raleigh, North Carolina, for appellees.

Panel

JUSTICE WELCH delivered the judgment of the court, with opinion.

Justices Goldenhersh and Stewart concurred in the judgment and opinion.

## OPINION

¶ 1   The plaintiff, Anthony Hill, appeals the order of the circuit court of Madison County dismissing his *pro se* defamation complaint filed against the defendants, Sanford Schmidt and Alton Telegraph. For the reasons that follow, we affirm the decision of the circuit court.

¶ 2   On April 27, 2011, Hill filed a *pro se* complaint against the defendants, Sanford Schmidt (the Alton Telegraph's courthouse reporter) and Alton Telegraph (the daily newspaper of Alton, Illinois), alleging defamation and reckless endangerment arising from a news report on the prosecution and sentencing of Hill in a murder case. Specifically, Hill alleged that an article published by the Alton Telegraph (the article was titled "Alton man gets 15 years in fatal shooting" and was published April 8, 2011) contained statements unfounded "in fact and substance" and resulted in Hill being labeled a jailhouse snitch. Hill further alleged Schmidt and Alton Telegraph had malicious intent in publishing the article, which was based on "assumptions and not facts," and the publication recklessly endangered his life.

¶ 3   The article, which was written by Schmidt, reported that Hill pleaded guilty to solicitation of murder after initially being charged with the first-degree murder of Willie Johnson. According to the article, Hill cooperated with authorities following his arrest. The article further stated that Hill agreed to testify against his brother, Demetrius Hill, who was the shooter in the case. Demetrius ultimately pleaded guilty to second-degree murder and was sentenced to 20 years in prison. The article identified Ben Beyers, an assistant State's Attorney for Madison County, as saying that Hill received a deal because he cooperated with authorities and had agreed to testify against the shooter. Beyers was quoted as saying that conflicting evidence existed as to whether Johnson had a gun and that a trial on a first-degree murder charge could have resulted in acquittal.

¶ 4   On April 28, 2011, Alton Telegraph published a correction to the original story, which stated that Hill cooperated with authorities but did *not* agree to testify against a codefendant, his *cousin* Demetrius Hill. The article clarified that the new information was provided to the newspaper by Hill's mother and was "contrary to facts reported in a recent account of Hill's guilty plea." The article concluded by stating that the "Telegraph regret[ed] the errors."

¶ 5   On June 7, 2011, the defendants filed an answer denying the allegations contained in Hill's *pro se* complaint. According to the answer, the published statements were a substantially accurate account of reports given by a public official (Ben Beyers) in his official capacity (as assistant State's Attorney) and were therefore immune from liability under the Illinois fair-report privilege. Also on June 7, 2011, the defendants filed a combined motion to dismiss and motion for summary judgment pursuant to section 2-619.1 of the Code of Civil Procedure (735 ILCS 5/2-619.1 (West 2010)). In the combined motions, the defendants argued that Hill's claims were barred under the first amendment and Illinois common law because a privilege existed for those who report on the contents of government records and proceedings, which included statements made by government officials in the course of their official duties. Specifically, the defendants noted that Schmidt relied on official statements made to him by Ben Beyers, an assistant State's Attorney, during an April 7, 2011, interview concerning Hill's prosecution. He also relied on official court proceedings concerning the prosecution. Additionally, the defendants argued that Hill's claim of reckless endangerment did not state a civil cause of action recognized under Illinois law. Further, the defendants argued Hill's defamation claim should fail because it was not pled with sufficient particularity to state a defamation claim. Specifically, the defendants noted that the *pro se* complaint did not identify with sufficient clarity and particularity the alleged defamatory statements, or even the article in which the defamatory statements were published. Last, the defendants argued they were entitled to a judgment as a matter of law because the pleadings and affidavits on file revealed that no genuine issue of material fact existed.

¶ 6   On July 6, 2011, Hill filed a *pro se* response to the defendants' combined motion to dismiss and for summary judgment, arguing the defendants failed to provide (1) any evidence that the statements contained in the article were accurate and (2) an affidavit from Beyers verifying that the statements contained in the article were obtained during an interview with him. According to Hill, the defendants were not protected under the Illinois fair-report privilege because the defamatory statements were (1) unfounded, (2) not matters of public concern, and (3) not statements made during judicial or quasi-judicial proceedings.

¶ 7   On July 18, 2011, the trial court dismissed Hill's *pro se* complaint with prejudice. First, the court determined that the statements in the article did not fall within one of the five categories of statements established under Illinois law as defamation *per se*. With regard to Hill's claim that the article resulted in him being labeled a jailhouse snitch, the court noted that defamation law did not protect against injury to antisocial reputation. The court then concluded that a statement identifying a person as a government informant cannot form the basis for a defamation suit.

¶ 8   The trial court further concluded that the reporter's privilege applied to Hill's claims. The court noted the relevant question to ask when determining whether the reporter's privilege applied was "whether the reporter reported what the official said." The court then concluded that the original article contained a fair and accurate summary of the official statements made by assistant State's Attorney Beyers. The court explained that public statements made by Beyers in his role as assistant State's Attorney were protected by the fair-report privilege because the State's Attorney's office was responsible for reviewing criminal charges. The court determined that Beyers's statements were "sufficiently public" because the privilege

extended to statements made by law enforcement officials acting in their official capacity.

¶ 9 Further, the court examined the corrected article and the statements made in the original article and determined that it did not believe that "the defendants truly harbor[ed] differing views on the question of the accuracy of the report of [Hill's] willingness to testify against his family member." Accordingly, the court dismissed Hill's *pro se* complaint with prejudice pursuant to the fair-report privilege. Hill appeals.

¶ 10 On appeal, Hill argues the trial court erred by dismissing his complaint because the statements contained in the April 2011 article were not protected by the fair-report privilege. Specifically, Hill argues the statements were not protected by the privilege because the statements were unfounded and not of public concern. He also argues that the defendants failed to present any evidence that (1) the interview with Beyers actually occurred and (2) Beyers made the statements contained in the article. He notes that the following consequences resulted from the article being published: (1) he was immediately discharged from his job as a mechanic in the family business (an allegation not included in the complaint), (2) he was labeled a jailhouse snitch, (3) his life was threatened, and (4) it detrimentally affected his relationship with his family (an allegation not included in the complaint). He points to the subsequently published correction to the initial article as support for his position that the statements in the first article were unfounded.

¶ 11 Section 2-619(a)(9) of the Code of Civil Procedure (735 ILCS 5/2-619(a)(9) (West 2010)) provides for the involuntary dismissal of a cause of action when the claim asserted against the defendant is barred by other affirmative matter avoiding the legal effect of or defeating the claim. The trial court's decision to grant a motion to dismiss is reviewed *de novo*. *Myers v. The Telegraph*, 332 Ill. App. 3d 917, 921 (2002). "For purposes of a section 2-619 motion, the court must treat as true all well-pleaded facts and reasonable inferences that can be drawn from the complaint." *Id.* at 921-22. The issue of privilege as an affirmative defense may be raised by and determined by a motion to dismiss under section 2-619. *O'Donnell v. Field Enterprises, Inc.*, 145 Ill. App. 3d 1032, 1041 (1986).

¶ 12 The fair-report privilege protects news accounts of written and verbal statements made by governmental agencies and officials acting in their official capacities. *Tepper v. Copley Press, Inc.*, 308 Ill. App. 3d 713, 717 (1999). "The publication of defamatory matter concerning another in a report of an official action or proceeding or of a meeting open to the public that deals with a matter of public concern is privileged if the report is accurate and complete or a fair abridgement of the occurrence reported." Restatement (Second) of Torts § 611 (1977). This definition was adopted by our supreme court in *Catalano v. Pechous*, 83 Ill. 2d 146, 167-68 (1980). The protection of the fair-report privilege extends to statements made in judicial proceedings. *Defend v. Lascelles*, 149 Ill. App. 3d 630, 636 (1986). The privilege has also been extended to statements of law enforcement officials made in their official capacities. *Myers*, 332 Ill. App. 3d at 923. Further, in *Dolatowski v. Life Printing & Publishing Co.*, 197 Ill. App. 3d 23, 29 (1990), the First District concluded that oral statements made by a deputy police superintendent in an interview with a reporter were protected by the fair-report privilege regardless of whether the statements were made in an interview setting as opposed to statements made during an official press release.

¶ 13   Here, the offending statements were obtained during an interview with Beyers in his official capacity as a prosecutor in the State's Attorney's office. The interview concerned Hill's involvement in the 2008 murder of Willie Johnson. Therefore, the fair-report privilege applies to the statements contained in the April 8, 2011, article as long as the summary was an accurate and complete report or a fair abridgement of the statements made by Beyers.

¶ 14   To qualify for the privilege, the news media is required to summarize the written or verbal statements in a fair and accurate manner. *Myers*, 332 Ill. App. 3d at 923. In determining whether the news account is an accurate and complete report or a fair abridgement of the statements, the court looks at the accuracy of the summary of the written or verbal statements rather than the truth or falsity of the information being summarized. *Hurst v. Capital Cities Media, Inc.*, 323 Ill. App. 3d 812, 818 (2001). The defendant can demonstrate the "substantial truth" of the report by showing that the "gist" or "sting" of the summary is true. *Gist v. Macon County Sheriff's Department*, 284 Ill. App. 3d 367, 371 (1996). "When determining the 'gist' or 'sting' of allegedly defamatory material, a trial court must 'look at the highlight of the article, the pertinent angle of it, and not to items of secondary importance which are inoffensive details, immaterial to the truth of the defamatory statement.' " *Id.* (quoting *Vachet v. Central Newspapers, Inc.*, 816 F.2d 313, 316 (7th Cir. 1987)).

¶ 15   Here, the record contains an affidavit of Schmidt filed in support of the defendants' section 2-619.1 motion that sets forth the official statements made to him by Beyers in the April 7, 2011, interview. According to the affidavit, Beyers reported that Hill pleaded guilty to solicitation of murder after initially being charged with first-degree murder. Beyers also stated that Hill agreed to testify against his brother, Demetrius Hill, who was the shooter. Further, Beyers stated that conflicting evidence existed as to whether the victim had a gun and that a trial on a first-degree murder charge could have resulted in an acquittal.

¶ 16   In the April 28, 2011, correction published in the Alton Telegraph, it was noted that Hill cooperated with authorities but did not agree to testify against a codefendant, his cousin Demetrius Hill. However, the author explained that the information was obtained from Hill's mother and that it was contrary to the facts reported in the original article. The article then stated that the Alton Telegraph regretted "the errors."

¶ 17   In its July 18, 2011, order, the trial court compared the statements contained in the original article with the content of the corrected article and concluded that the original article contained a sufficiently fair and accurate summary of the official statements made by Beyers in his capacity as the assistant State's Attorney. The trial court stated as follows with regard to its comparison of the two articles:

"[I]n the April 8, 2011[,] article, Defendant Schmidt reports that Beyer[s] said plaintiff agreed to testify against his brother, but in the 4-28-11 publication, the paper reports that the plaintiff's mother states there was an agreement to cooperate with authorities, but no agreement to testify against his cousin. There is thus between the two publications a difference as to the relationship, (brother as opposed to cousin), and as to whether Anthony Hill agreed to testify against the relative, but not as to whether Anthony Hill agreed to cooperate with authorities.

Although the reporter is consistent in his representation that Ben Beyer[ ]s said that plaintiff would testify against a family member in both his affidavit and his April 8th article, the court considers whether, by its correction, the paper itself creates such a question as to the accuracy of the reporter's rendition of the event that the privilege cannot apply. Since it cannot be said that the gravamen of the plaintiff's case (to the extent it can be discerned), turns on which family member he is testifying against, the court focuses on the difference between the April 8 article and the correction on whether [he was] willing to testify.

The correction is ambiguous, depending on whether the boilerplate ('Correction,' 'regrets the errors') or the content, is stressed.

Since it is labeled as a 'correction', the reader could conclude some extra import of the second statement, as the paper itself in effect says, by that label, that its prior formulation was not correct. The paper also says it regrets the errors, which suggests it's abandoning errors to the extent of the correction. On the one hand, then, one defendant, the Telegraph, corrects the other defendant, its reporter, considers his work in error and contrary to the correction, and regrets the error.

On the other hand, the paper suggests, through the substantive content of the correction, that the plaintiff's mother has something to say contrary to the facts as stated in the paper's prior reporting. The suggestion is also that readers consider the source of the correction, the plaintiff['s] mother, which could be compared with the source of the prior article, the Assistant State's attorney. The mother of the plaintiff would be better aware of the family relation, (cousin, not brother) but perhaps not of the plaintiff's discussions with the assistant state's attorney as to plaintiff's level of cooperation or willingness to testify against the family member. While it's labeled as a correction, the content of the second publication is to add to what was stated before, to place the new information before the reader, but also to refer back to the previous report.

* * *

Under the relevant privilege law, it is not the fact of a difference of viewpoint as to whether the shooter was plaintiff's brother or his cousin, or as to whether the mother or the state's attorney is right about whether plaintiff agreed to testify against him. In resolving whether the privilege applies, the court does not question whether someone else believes differently than the official, or whether someone else is more correct than the official, or whether the status of affairs in the world is entirely different than that described by the official or in official proceedings, rather the court merely asks whether the reporter reported what the official said.

The court does not conclude, based on the correction, with its boilerplate 'The Telegraph regrets the errors', that the defendants truly harbor differing views on the question of the accuracy of the report of [Hill's] willingness to testify against his family member *or* that either the defendants or the average reader would conclude a retraction of the accuracy of the reporting of Beyer[s]'s 4-7-11 statement in the 4-8-11 article. The court does not conclude, based on this record, that defendant Schmidt substantially inaccurately communicated what Beyer[s] said." (Emphasis in original.)

¶ 18    The court then concluded that the main elements of privilege were alleged by *Hill* in the first paragraph of his complaint. Specifically, Hill stated as follows in the first paragraph of his *pro se* complaint: "Defendant Sanford [Schmidt] intentionally submitted a story that he knew was unfounded, as his information came from Assistant State['s] Attorney Ben Beyers who is quoted as saying that there was conflicting evidence that could have resulted in an acquittal if plaintiff went to trial." The court determined Beyers's public statements were protected by the fair-report privilege because the State's Attorney's office was responsible for reviewing criminal charges and would therefore be considered law enforcement. The court further concluded that the statements made by Beyers were "sufficiently public" because it was a statement made by a law enforcement official in his official capacity.

¶ 19    The only *significant* difference between the two articles is that the corrected article reported that Hill did *not* agree to testify against a family member. However, the author explained that this information was obtained from Hill's mother and was contrary to the statements published in the original article. Like the trial court, we believe that the April 28, 2011, corrected article does not indicate that the defendants were attempting to correct the accuracy of the information contained in the original report. Instead, the language of the corrected article merely revealed that the defendants received a different version of the circumstances surrounding Hill's prosecution of Johnson's murder. As explained by the trial court, the proper focus under the fair-report-privilege law is whether the reporter accurately reported what the official said, not whether someone disagreed with the reported summary. In his affidavit, defendant Schmidt maintained that his original article accurately reported what Beyers said in the April 7, 2011, interview. Further, we note that both the original article and the corrected article reported that Hill *agreed* to cooperate with authorities in the prosecution of Johnson's murder.

¶ 20    Additionally, Hill himself alleged in his complaint that the information from the article was obtained from Beyers. Therefore, we find that the original article contained a sufficiently fair and accurate summary of the official statements made by Beyers in his capacity as the assistant State's Attorney. Accordingly, the trial court did not err in determining that the statements were protected under the fair-report privilege.

¶ 21    The trial court also determined that, regardless of the applicability of the fair-report privilege, the statements contained in the original article did not constitute defamation *per se* or defamation *per quod*.

¶ 22    "A defamatory statement is a statement that harms a person's reputation to the extent it lowers the person in the eyes of the community or deters the community from associating with her or him." *Solaia Technology, LLC v. Speciality Publishing Co.*, 221 Ill. 2d 558, 579 (2006). Two types of defamatory statements have been recognized under Illinois law: defamation *per se* and defamation *per quod*. *Brennan v. Kadner*, 351 Ill. App. 3d 963, 968 (2004).

¶ 23    A statement constitutes defamation *per se* if the harm is obvious or apparent on its face. *Solaia Technology, LLC*, 221 Ill. 2d at 579. Illinois recognizes the following five categories of statements as defamation *per se*: (1) words that impute the commission of a crime, (2) words that impute an infection with a loathsome communicable disease, (3) words that

-7-

impute an inability to perform or lack of integrity in performing employment duties, (4) words that prejudice a party or impute a lack of ability in a person's profession, and (5) words that impute a person has engaged in adultery or fornication. *Id.* at 579-80.

¶ 24     Here, the offensive statements contained in the original article did not fall within one of the five categories of statements that Illinois has recognized as actionable as defamation *per se*. Therefore, the trial court correctly determined that the statements contained in the original article did not constitute defamation *per se*.

¶ 25     Defamation *per quod* occurs where either the defamatory character of a statement is not evident on its face and extrinsic evidence is needed to explain its defamatory meaning or a statement is defamatory on its face but does not fit within one of the five categories of statements actionable as defamation *per se*. *Bryson v. News America Publications, Inc.*, 174 Ill. 2d 77, 103 (1996). In order to recover under defamation *per quod*, the plaintiff must plead and prove special damages, *i.e.*, actual damages of a pecuniary nature. *Kurczaba v. Pollock*, 318 Ill. App. 3d 686, 694 (2000). "[G]eneral allegations such as damage to one's health or reputation, economic loss, and emotional distress are insufficient to state a cause of action for defamation *per quod*." *Id*.

¶ 26     Here, the trial court found that defamation *per quod* was not applicable to Hill's claims because he failed to allege special damages. Based on our review of Hill's *pro se* complaint, we agree with the trial court that Hill failed to plead and prove special damages. For the foregoing reasons, the judgment of the circuit court of Madison County is hereby affirmed.

¶ 27     Affirmed.